[Cite as *In re H.H.*, 2021-Ohio-1732.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

In the Matter of: :

[H.H. : No. 20AP-362
(C.P.C. No. 17JU-13502)

:

J.H., Father, : (REGULAR CALENDAR)

:

Appellant].

:

D E C I S I O N

Rendered on May 20, 2020

**On brief:** *Emily L. McDonnell*, for Franklin County Children Services.

**On brief:** *Yeura R. Venters*, Public Defender, and *George Schumann*, for appellant.

APPEAL from the Franklin County Court of Common Pleas,
Division of Domestic Relations, Juvenile Branch

DORRIAN, P.J.

{¶ 1} Appellant, J.H., father of H.H., appeals the June 25, 2020 decision and judgment entry of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, which overruled appellant's objection to the juvenile court magistrate's January 27, 2020 decision granting the motion of appellee, Franklin County Children Services ("FCCS"), to place H.H. in a planned permanent living arrangement ("PPLA"). For the following reasons, we affirm.

**I. Facts and Procedural History**

{¶ 2} On November 6, 2017, FCCS filed a complaint alleging H.H. was a dependent child pursuant to R.C. 2151.04(C).[1] On November 8, 2017, the juvenile court magistrate

---

[1] We note that FCCS indicated this was the first refiling of the complaint.

held a hearing at which the following individuals were present: J.H., who was represented by counsel; Trish Stephens, FCCS liaison; Robert Petty, guardian ad litem for H.H., and an assistant prosecuting attorney. On the same date, the juvenile court magistrate filed an order granting temporary custody of H.H. to FCCS and an entry containing findings of fact and conclusions of law, which were incorporated into the magistrate's order. The magistrate found that FCCS assumed custody of H.H. from J.H. and placed H.H. in residential treatment for evaluation due to a significant mental health diagnosis. The magistrate found J.H. stated H.H. could not return home without a significant change in behavior. As a result, the magistrate found reasonable efforts had been made to prevent the removal of H.H. from the home.

{¶ 3} On January 19, 2018, Brian M. Furniss, acting as H.H.'s guardian ad litem ("GAL Furniss"), filed a report and recommendation. On January 22, 2018, the juvenile court magistrate held a hearing on the dependency complaint. On February 13, 2018, FCCS filed a case plan. On February 15, 2018, the juvenile court magistrate filed a decision, which was approved and adopted by the juvenile court, finding H.H. to be a dependent minor under R.C. 2151.04(C), approving and adopting the case plan, and granting temporary court custody of H.H. to FCCS.

{¶ 4} On February 20, 2018, FCCS filed a semi-annual review. On July 13, 2018, FCCS filed a motion for PPLA pursuant to R.C. 2151.415 and Juv.R. 14 and 19. On August 15, 2018, GAL Furniss filed a report and recommendation. On November 7, 2018, FCCS filed a semi-annual review. On December 11, 2018, the juvenile court magistrate held a hearing on FCCS's July 13, 2018 motion for PPLA. On December 17, 2018, the juvenile court magistrate filed a decision amending FCCS's July 13, 2018 motion for PPLA at the request of FCCS to reflect a request for extension of temporary court custody and granting such motion.

{¶ 5} On January 31, 2019, FCCS filed a second motion for PPLA pursuant to R.C. 2151.415 and Juv.R. 14 and 19. On March 21, 2019, GAL Furniss filed a report and recommendation. On March 22, 2019, the juvenile court magistrate held a hearing on FCCS's January 31, 2019 motion for PPLA. On March 26, 2019, the juvenile court magistrate filed findings of fact and conclusions of law. On March 27, 2019, the juvenile court magistrate filed a decision, which was approved and adopted by the juvenile court,

amending FCCS's January 31, 2019 motion for PPLA at the request of FCCS to reflect a request for extension of temporary court custody and granting the motion for a second extension of temporary court custody.

{¶ 6} On July 3, 2019, FCCS filed a third motion for PPLA pursuant to R.C. 2151.415 and Juv.R. 14 and 19. On August 14, 2019, GAL Furniss filed a report and recommendation. On November 7 and December 16, 2019, the juvenile court magistrate held hearings on FCCS's July 3, 2019 motion for PPLA.

{¶ 7} At the hearing, Rachel Buchhop, program coordinator at Genacross Family and Youth ("Genacross"), testified that H.H. had been placed at Genacross in 2017. Prior to arriving at Genacross, H.H. had been at Nationwide Children's Hospital. Providers at Nationwide Children's Hospital recommended H.H. be placed in a residential treatment facility.

{¶ 8} According to Buchhop, H.H., who was 17 years old at the time of the hearings, displayed thinking ability consistent with a five or six-year-old child and was unable to care for herself. H.H. received medications four times a day to treat mood swings in which she displayed verbal and physical aggression, sleeping issues, attention deficit and hyperactivity disorder ("ADHD"), and behavioral outbursts. H.H.'s behavioral outbursts included physical violence, dangerous behavior with imaginary friends, and sexual improprieties. H.H. received residential schooling due to her behavioral issues. H.H. had an Individualized Education Plan ("IEP"). H.H. was supervised at all times, including constantly being within the line of sight of monitoring personnel. According to Buchhop, H.H.'s behavior had "drastically" become worse over the last year while at Genacross. (Nov. 7, 2019 Tr. at 39.)

{¶ 9} Buchhop testified that H.H. received regular phone calls from her two grandmothers; however, H.H.'s grandmothers had never physically visited Genacross. According to Buchhop, H.H. preferred to speak with her grandmothers instead of J.H. Buchhop stated that J.H. had not attended semi-annual reviews or met with H.H.'s medical providers. At the time of the hearing in November 2019, J.H. last visited H.H. at Genacross in February 2019.

{¶ 10} Buchhop expressed concern with H.H. returning home with J.H. due to the presence of H.H.'s younger siblings in the home. H.H. physically attacked and targeted

younger children at Genacross and made homicidal comments toward younger children when she was agitated. According to Buchhop, H.H. wished to be placed with her grandmothers.

{¶ 11} Carrie Metzker, a district representative from Columbus City Schools, testified that she participated in creating three IEPs for H.H. According to Metzker, J.H. was invited to participate in but did not attend any meetings regarding the creation of H.H.'s IEPs.

{¶ 12} J.H. testified he has four children, including H.H. According to J.H., he moved H.H. from Kansas to Ohio in May or June 2017. In July 2017, he entered into a voluntary custody agreement with FCCS.

{¶ 13} According to J.H., H.H. had been prescribed and was taking 1,200 milligrams of Seroquel before they moved to Ohio. The doctor who prescribed H.H. that amount of Seroquel had not seen H.H. since she was approximately five or six years old. After moving to Ohio, J.H. had difficulty filling H.H.'s prescription for Seroquel because H.H. did not see a psychiatrist. J.H. believed H.H.'s behavior would be better if she again received the amount of Seroquel that she had been prescribed in Kansas. J.H. acknowledged the amount of Seroquel H.H. had previously been prescribed was 50 percent higher than the maximum dosage recommended by the Food and Drug Administration.

{¶ 14} J.H. stated he had not completed any parenting classes in Ohio although he had been required to do so under the case plan. J.H. did not recall that the case plan required him to be involved with H.H.'s medical appointments and admitted he had not attended any of H.H.'s medical appointments since H.H. had been placed at Genacross. J.H. disputed Genacross' records that he had only been to Genacross to visit H.H. three times. According to J.H., he had visited H.H. at Genacross between seven to ten times. J.H. agreed that H.H. had been placed in seven different treatment facilities or hospitals to his knowledge.

{¶ 15} J.H.'s two youngest children, who were approximately two and one-half years old and 15 months old respectively, lived with J.H., J.H.'s wife, and his wife's father and stepmother. According to J.H., if H.H. was returned to his custody, she would have her own room, while J.H., his wife, and the two other children would stay together in another

room. According to J.H., he was self-employed at the time of the hearing. Neither J.H. nor his wife had a driver's license.

{¶ 16} Emily Brown testified she was previously the FCCS caseworker assigned to H.H.'s case from July 24, 2017 until November 20, 2018. According to Brown, H.H.'s case began due to H.H. experiencing suicidal and homicidal ideations. Specifically, after H.H.'s now two-year-old sibling was born, H.H. stated she wanted to kill her sibling, her family, and herself. FCCS entered into a voluntary agreement with J.H. on July 20, 2017. After entering into the agreement, H.H. was admitted to Nationwide Children's Hospital for a period of 37 days, during which time H.H. was diagnosed with unspecified mood disorder, autism spectrum disorder, and intellectual disability.

{¶ 17} According to Brown, J.H. was involved with H.H.'s medical treatment during her time as H.H.'s caseworker. Specifically, J.H. believed H.H. was undermedicated and requested 1,200 milligrams of Seroquel to be prescribed for H.H. Brown conveyed this request to a physician, but it was rejected by the physician as unethical. Brown testified that Seroquel had been discontinued for H.H.'s treatment and that H.H. was instead receiving Latuda for behavioral issues.

{¶ 18} According to Brown, FCCS provided J.H. with bus passes and cab fare to visit H.H. Of the five appointments Brown scheduled for J.H. to visit H.H., J.H. attended only two. Brown never observed interactions between J.H. and H.H. According to Brown, H.H. was consistent in her wish to live with her grandmother. H.H. did not wish to live with J.H. Brown testified that H.H.'s mother had never been involved with the case while Brown was H.H.'s caseworker.

{¶ 19} Brown testified that alternatives to PPLA were considered. Brown referred H.H. to the Franklin County Board of Developmental Disabilities. If H.H.'s behavior no longer required placement in a residential facility, Brown considered it possible for H.H. to live in Franklin County with services from the Franklin County Board of Developmental Disabilities.

{¶ 20} Gloria Butler, an FCCS caseworker, testified she became the caseworker for H.H.'s case on November 20, 2018. Butler testified H.H. was diagnosed with ADHD and was receiving Latuda for behavioral issues. According to Butler, J.H. had not communicated with her about H.H.'s medical diagnoses and H.H.'s ongoing needs during

her time as H.H.'s caseworker. J.H. had not attended any meetings about H.H.'s treatment to Butler's knowledge. According to Butler, J.H. was provided with information on parenting classes but did not complete them. Butler scheduled five appointments and provided transportation for J.H. to visit H.H.; however, J.H. only attended one of the visits. Butler believed that PPLA was the most appropriate result because H.H.'s grandmother was unable to care for her and it was recommended that H.H. remain in a structured environment.

{¶ 21} Furniss testified he was appointed GAL for H.H. Furniss had not had an opportunity to review any interaction between H.H. and J.H. because J.H.'s visits were "rather sporadic." (Dec. 16, 2019 Tr. at 60.)

{¶ 22} When asked whether H.H. was able to understand the nature of the proceedings in order to ascertain her wishes, GAL Furniss replied that H.H. is "at that level of development [where] I think [H.H. is] able to understand what she wants." (Dec. 16, 2019 Tr. at 62.) Regarding H.H.'s wishes, GAL Furniss testified as follows:

> The last time I was up there I did not as[k] [H.H.] the -- the wishes. For [H.H.], I think it kind of - - your ability to ask those kinds of things depends on the day and how she's doing on a given day. When I was up there the last time [H.H.] wanted - - [H.H.] kind of sets the tone for what she wants to talk about. The last time [H.H.] wanted to talk about going apple picking, which is what they were gonna (sic) be doing the next day. * * * So I did not address that with her. I had talked to her previously in the case, but not about - - not specifically about the PPLA.

(Dec. 16, 2019 Tr. at 60-61.) When asked again about whether he had discussed H.H.'s wishes, GAL Furniss replied "[a]gain not - - not at the last visit but - - but previously * * * [H.H. has] been happy to be where she is." (Dec. 16, 2019 Tr. at 62.) GAL Furniss testified that Genacross had "done * * * a good job in my opinion of accommodating [H.H.'s] needs and wants to the point that she's happy there." (Dec. 16, 2019 Tr. at 63.) When asked on cross-examination whether he had specifically discussed PPLA with H.H., GAL Furniss replied "I have not and I have not felt that it would be productive to try to do that." (Dec. 16, 2019 Tr. at 65.)

{¶ 23} GAL Furniss did not believe J.H. would be able to provide a safe and stable home for H.H. due to her specific needs. Furthermore, GAL Furniss believed it would not be appropriate to place H.H. in J.H.'s home around her younger siblings because of H.H.'s

aggression toward younger children. GAL Furniss believed PPLA was "exactly what [H.H.] needs." (Dec. 16, 2019 Tr. at 63.)

{¶ 24} On January 27, 2020, the juvenile court magistrate filed a decision, which was approved and adopted by the juvenile court, granting FCCS's July 3, 2019 motion for PPLA pursuant to R.C. 2151.353(A)(5).

{¶ 25} On February 3, 2020, the juvenile court magistrate held a hearing. On February 6, 2020, J.H. filed an objection to the January 27, 2020 magistrate's decision. On February 12, 2020, FCCS filed a case plan. On February 14, 2020, the juvenile court magistrate filed a decision, which was approved and adopted by the juvenile court, approving and adopting the case plan as an order of the court. On June 5, 2020, J.H. filed a supplemental objection to the January 27, 2020 magistrate's decision. On June 22, 2020, FCCS filed a memorandum contra J.H.'s objection to the January 27, 2020 magistrate's decision. On June 25, 2020, the juvenile court filed a decision and judgment entry overruling J.H.'s objection to the magistrate's decision.

## II. Assignment of Error

{¶ 26} J.H. appeals and assigns the following sole error for our review:

> The juvenile court erred in overruling the defendant-appellant father's objection to the magistrate's decision granting planned permanent living arrangement (PPLA) of the minor child under R.C. 2151.415(C)(1)(a), as neither the juvenile judge nor the magistrate considered the best interest factors under R.C 2151.414(D)(1)(a), (b), (c), (d) or (e), as required by R.C. 2151.414(D)(1) and R.C. 2151.415(C)(1).

## III. Analysis

{¶ 27} In his sole assignment of error, J.H. argues the juvenile court erred in overruling his objection to the magistrate's January 27, 2020 decision granting FCCS's motion for PPLA because the juvenile court failed to consider the best-interest factors under R.C. 2151.414(D)(1).

## A. Applicable Law

{¶ 28} "The right to parent one's child is a fundamental right protected by the Due Process Clause of the Fourteenth Amendment to the United States Constitution and Article I, Section 16, of the Ohio Constitution." *In re L.W.*, 10th Dist. No. 17AP-586, 2018-Ohio-2099, ¶ 6. *See also In re Murray*, 52 Ohio St.3d 155, 157 (1990), quoting *Stanley v. Illinois*,

405 U.S. 645, 651 (1972) ("[T]he right to raise one's children is an 'essential' and 'basic civil right.' "). "Parents have a 'fundamental liberty interest' in the care, custody, and management of the child." *Id.* at 157, quoting *Santosky v. Kramer*, 455 U.S. 745, 753 (1982). However, parental rights are not absolute and are always subject to the ultimate welfare of the child. *In re E.B.*, 10th Dist. No. 16AP-352, 2017-Ohio-2672, ¶ 19, citing *In re K.M.*, 10th Dist. No. 15AP-64, 2015-Ohio-4682, ¶ 15, citing *In re Cunningham*, 59 Ohio St.2d 100, 106 (1979); *In re B.C.*, 141 Ohio St.3d 55, 2014-Ohio-4558, ¶ 20.

{¶ 29} R.C. 2151.415 provides for a children services agency that has been given temporary custody of a child, pursuant to R.C. 2151.353(A), to file a motion seeking an order of disposition for the child. *In re M.W.*, 10th Dist. No. 11AP-524, 2011-Ohio-6392, ¶ 26, citing *In re S.W.*, 10th Dist. No. 05AP-1368, 2006-Ohio-2958, ¶ 35. Among six potential orders of disposition, R.C. 2151.415(A)(5) provides for a children services agency to file a motion with the juvenile court seeking "[a]n order that the child be placed in a planned permanent living arrangement." "Planned permanent living arrangement" is defined as an order of a juvenile court to which both of the following apply:

> (a) The court gives legal custody of a child to a public children services agency or a private child placing agency without the termination of parental rights.

> (b) The order permits the agency to make an appropriate placement of the child and to enter into a written agreement with a foster care provider or with another person or agency with whom the child is placed.

R.C. 2151.011(B)(38).

{¶ 30} "Legal custody" is defined as:

> [A] legal status that vests in the custodian the right to have physical care and control of the child and to determine where and with whom the child shall live, and the right and duty to protect, train, and discipline the child and to provide the child with food, shelter, education, and medical care, all subject to any residual parental rights, privileges, and responsibilities. An individual granted legal custody shall exercise the rights and responsibilities personally unless otherwise authorized by any section of the Revised Code or by the court.

R.C. 2151.011(B)(21).

{¶ 31} R.C. 2151.353 governs the orders of disposition that may be granted by a juvenile court for a child adjudicated an abused, neglected, or dependent child. Pursuant to R.C. 2151.353(A)(5), a juvenile court may order a child to be placed in PPLA provided that:

> [A] public children services agency or private child placing agency requests the court to place the child in a planned permanent living arrangement and if the court finds, by clear and convincing evidence, that a planned permanent living arrangement is in the best interest of the child, that the child is sixteen years of age or older, and that one of the following exists:
>
> (a) The child, because of physical, mental, or psychological problems or needs, is unable to function in a family-like setting and must remain in residential or institutional care now and for the foreseeable future beyond the date of the dispositional hearing held pursuant to section 2151.35 of the Revised Code.
>
> (b) The parents of the child have significant physical, mental, or psychological problems and are unable to care for the child because of those problems, adoption is not in the best interest of the child, as determined in accordance with division (D)(1) of section 2151.414 of the Revised Code, and the child retains a significant and positive relationship with a parent or relative.
>
> (c) The child has been counseled on the permanent placement options available to the child, and is unwilling to accept or unable to adapt to a permanent placement.

*See* R.C. 2151.415(C)(1). Thus, on a motion from a children services agency, a court must find by clear and convincing evidence that PPLA is in the best interest of the child, the child is at least 16 years old, and that one of the specified conditions exist. *See In re A.B.*, 110 Ohio St.3d 230, 2006-Ohio-4359, ¶ 33 ("A planned permanent living arrangement places a child in limbo, which can delay placement in a permanent home. Because the General Assembly intended to encourage speedy placement, R.C. 2151.353 places limitations upon the use of planned permanent living arrangements.").

{¶ 32} R.C. 2151.414(D)(1) governs the juvenile court's consideration of best-interest factors, providing as follows:

> In determining the best interest of a child at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) or (5) of section 2151.353 or division (C) of

section 2151.415 of the Revised Code, the court shall consider all relevant factors, including, but not limited to, the following:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

{¶ 33} R.C. 2151.414(D)(1). The additional factors referenced by R.C. 2151.414(D)(1)(e) are:

(7) The parent has been convicted of or pleaded guilty to one of [a list of criminal offenses].

(8) The parent has repeatedly withheld medical treatment or food from the child when the parent has the means to provide the treatment or food, and, in the case of withheld medical treatment, the parent withheld it for a purpose other than to treat the physical or mental illness or defect of the child by spiritual means through prayer alone in accordance with the tenets of a recognized religious body.

(9) The parent has placed the child at substantial risk of harm two or more times due to alcohol or drug abuse and has rejected treatment two or more times or refused to participate

in further treatment two or more times after a case plan issued pursuant to section 2151.412 of the Revised Code requiring treatment of the parent was journalized as part of a dispositional order issued with respect to the child or an order was issued by any other court requiring treatment of the parent.

(10) The parent has abandoned the child.

(11) The parent has had parental rights involuntarily terminated with respect to a sibling of the child pursuant to this section or section 2151.353 or 2151.415 of the Revised Code, or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to those sections, and the parent has failed to provide clear and convincing evidence to prove that, notwithstanding the prior termination, the parent can provide a legally secure permanent placement and adequate care for the health, welfare, and safety of the child.

R.C. 2151.414(E)(7) through (11). Pursuant to R.C. 2151.415(C)(2)(a), a court issuing an order placing a child in PPLA "shall issue a finding of fact setting forth the reasons for its finding."

**B. Analysis**

{¶ 34} Here, J.H. does not challenge the juvenile court's resolution of the best-interest factors but, rather, argues that the juvenile court's analysis failed to comport with the statutory requirements. Specifically, J.H. asserts the juvenile court erred by considering factors under R.C. 3109.04(F)(1), (2), and (3) instead of the best-interest factors under R.C. 2151.414(D)(1).

{¶ 35} The Supreme Court of Ohio has held that "R.C. 2151.414(D)(1) does not require a juvenile court to expressly discuss each of the best-interest factors in R.C. 2151.414(D)(1)(a) through (e)." *In re A.M.*, ___ Ohio St.3d ___, 2020-Ohio-5102, ¶ 31. Thus, although a juvenile court need not "include in its decision a written discussion of or express findings regarding each of the best-interest factors," a court reviewing such decision "must be able to discern from the magistrate's or juvenile court's decision and the court's

judgment entry that the court satisfied the statutory requirement that it consider the enumerated factors." *Id.*[2]

{¶ 36} Here, the juvenile court stated that "[i]n determining the best interest of a child, the court shall consider all relevant factors and considerations including those under R.C. 3109.04(F)(1), (2), and (3)."[3] (June 25, 2020 Decision at 13.) The juvenile court's

---

[2] We encourage juvenile courts to clearly articulate that they have considered all relevant best-interest factors pursuant to R.C. 2151.414(D)(1) and make findings on the same. *See A.M.* at ¶ 42 (stating that "it is preferable for a juvenile court to provide some discussion or analysis of the best-interest factors to aid in appellate review and to increase confidence in its decision"). If we are unable to discern from the record whether the juvenile court has complied with R.C. 2151.414(D)(1), consistent with *A.M.*, we must remand in order to effectuate meaningful appellate review.

[3] R.C. 3109.04, a section of Title 31 of the Revised Code, which governs Domestic Relations, applies "[i]n any divorce, legal separation, or annulment proceeding and in any proceeding pertaining to the allocation of parental rights and responsibilities for the care of a child." R.C. 3109.04(A). R.C. 3109.04(F) provides a list of factors for a court to consider when determining whether shared parenting is appropriate and allocating parental rights and responsibilities for the care of children, including, in part, the best interest of the child.

We are mindful that the Supreme Court in *A.M.* recognized it was important that a juvenile court acknowledge the applicable statutory framework. *See A.M.* at ¶ 40 ("When the record indicates that a juvenile court, in response to timely filed objections, has undertaken an independent review of the evidence, *has acknowledged the applicable statutory framework*, has adopted the magistrate's findings of fact, and has made the required conclusions upon clear and convincing evidence, we can only conclude that the court has satisfied its obligation under Juv.R. 40(D)(4)(d)."). (Emphasis added.) While the juvenile court in its decision overruling J.H.'s objection discusses R.C. 2151.415(C), it did not refer to the best-interest factors it was required to consider under R.C. 2151.414(D)(1) and, instead, pointed to R.C. 3109.04(F). Notwithstanding the juvenile court's erroneous reference to R.C. 3109.04(F), it is clear the juvenile court was not applying the factors in R.C. 3109.04(F) as cited below. Because the juvenile court cited R.C. 2151.415(C) and we are able to discern from the juvenile court's decision that it considered the appropriate factors under R.C. 2151.414(D)(1), we find the juvenile court's erroneous reference to R.C. 3109.04(F) to not be prejudicial.

Specifically, R.C. 3109.04(F) provides:

(1) In determining the best interest of a child pursuant to this section, whether on an original decree allocating parental rights and responsibilities for the care of children or a modification of a decree allocating those rights and responsibilities, the court shall consider all relevant factors, including, but not limited to:
(a) The wishes of the child's parents regarding the child's care;
(b) If the court has interviewed the child in chambers pursuant to division (B) of this section regarding the child's wishes and concerns as to the allocation of parental rights and responsibilities concerning the child, the wishes and concerns of the child, as expressed to the court;
(c) The child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest;
(d) The child's adjustment to the child's home, school, and community;
(e) The mental and physical health of all persons involved in the situation;
(f) The parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights;
(g) Whether either parent has failed to make all child support payments, including all arrearages, that are required of that parent pursuant to a child support order under which that parent is an obligor;
(h) Whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to any criminal offense involving any act that resulted in a child being

decision included extensive findings of fact and a thorough examination of the factors it considered in reaching its conclusions of law. Furthermore, the court specifically noted that it considered "all relevant factors" in determining the best interest of H.H. (June 25, 2020 Decision at 13.) Thus, although the juvenile court did not specifically point to the factors it was required to consider under R.C. 2151.414(D)(1), pursuant to *A.M.*, we must nevertheless consider whether the juvenile court's decision supports the conclusion that it satisfied the statutory requirement to consider the R.C. 2151.414(D)(1) factors.

### 1. Child's Interactions and Relationships

{¶ 37} The first factor in determining whether an order granting PPLA is in the child's best interest requires considering the interactions and interrelationships of the child with their parents, siblings, relatives, foster caregivers, and others. R.C. 2151.414(D)(1)(a). J.H. contends the juvenile court did not adequately consider this factor. However, the

an abused child or a neglected child; whether either parent, in a case in which a child has been adjudicated an abused child or a neglected child, previously has been determined to be the perpetrator of the abusive or neglectful act that is the basis of an adjudication; whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to a violation of section 2919.25 of the Revised Code or a sexually oriented offense involving a victim who at the time of the commission of the offense was a member of the family or household that is the subject of the current proceeding; whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to any offense involving a victim who at the time of the commission of the offense was a member of the family or household that is the subject of the current proceeding and caused physical harm to the victim in the commission of the offense; and whether there is reason to believe that either parent has acted in a manner resulting in a child being an abused child or a neglected child;

(i) Whether the residential parent or one of the parents subject to a shared parenting decree has continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court;

(j) Whether either parent has established a residence, or is planning to establish a residence, outside this state.

(2) In determining whether shared parenting is in the best interest of the children, the court shall consider all relevant factors, including, but not limited to, the factors enumerated in division (F)(1) of this section, the factors enumerated in section 3119.23 of the Revised Code, and all of the following factors:

(a) The ability of the parents to cooperate and make decisions jointly, with respect to the children;

(b) The ability of each parent to encourage the sharing of love, affection, and contact between the child and the other parent;

(c) Any history of, or potential for, child abuse, spouse abuse, other domestic violence, or parental kidnapping by either parent;

(d) The geographic proximity of the parents to each other, as the proximity relates to the practical considerations of shared parenting;

(e) The recommendation of the guardian ad litem of the child, if the child has a guardian ad litem.

(3) When allocating parental rights and responsibilities for the care of children, the court shall not give preference to a parent because of that parent's financial status or condition.

magistrate's decision and the juvenile court's decision overruling J.H.'s objection contain factual findings regarding H.H.'s interrelationships.  The juvenile court found in part that "H.H. was voluntarily removed from the care of [J.H.] due to homicidal and suicidal threats to herself and family, including a young sibling." (June 25, 2020 Decision at 16.) Furthermore, the juvenile court found that "[s]ince [H.H.'s] placement at Genacross, [J.H.] has only visited with [H.H.] three times." (June 25, 2020 Decision at 16.)  Therefore, we find the magistrate's decision and the juvenile court's decision overruling J.H.'s objection demonstrate the court satisfied its duty to consider the best-interest factor under R.C. 2151.414(D)(1)(a).

### 2. Child's Wishes

{¶ 38} The second factor in determining whether an order granting PPLA is in the child's best interest requires considering the wishes of the child, as expressed directly by the child or through the child's guardian ad litem. The court must give due regard to the child's maturity. R.C. 2151.414(D)(1)(b). The magistrate's decision notes GAL Furniss' testimony that H.H. "need[ed] * * * structured residential treatment." (Jan. 27, 2020 Mag.'s Decision at 2.)  In his March 21, 2019 report, GAL Furniss stated that H.H. "is cognitively delayed to the point that she cannot comprehend PPLA." (Report at 2.)   At the PPLA hearing, GAL Furniss testified to H.H.'s understanding of the proceedings and wishes:

> [FCCS Counsel]: [D]o you believe that [H.H. is] able to understand the proceedings that are going on when you try to talk to [H.H.] about them?
>
> [GAL Furniss]: [H.H. is] - - at that level of development I think [H.H. is] able to understand what she wants.
>
> [FCCS Counsel]: And have you discussed them with [H.H.]?
>
> [GAL Furniss]: Again, not - - not at the last visit but * * * previously [H.H. has] been happy to be where she is. * * * [H.H.] will fixate on things and the facility has really kinda (sic) given her a lot of leeway to have her particular passion at the moment. * * * [T]hey have done a  - - a good job in my opinion of accommodating [H.H.'s] needs and wants to the point that [H.H. is] happy there.
>
> * * *
>
> [FCCS Counsel]: [W]hat is your opinion or your recommendation regarding [FCCS's] motion for * * * PPLA?

[GAL Furniss]: Regarding the PPLA, I think it's * * * exactly what [H.H.] needs. [H.H. is] a kid that I would envision aging out at 21, given her special needs. * * * [I]n this case I think everybody sees that [H.H.], given [H.H.'s] level of development, needs to be in that structured environment for as long as we can possibly have her there.

* * *

[FCCS Counsel]: Has [H.H.] ever consistently stated that she wanted to return home to [J.H.]?

[GAL Furniss]: To my knowledge, she has not.

(Dec. 16, 2019 Tr. at 62-64.) In addition to adopting the magistrate's decision, the juvenile court referred to the testimony of GAL Furniss in its decision overruling J.H.'s objection, including specifically noting GAL Furniss' testimony that "Genacross accommodates [H.H.'s] needs and [H.H.] is happy there." (June 25, 2020 Decision at 10.) Additionally, the juvenile court found that H.H. "want[ed] to live with Maternal Grandmother, however Maternal Grandmother has stated that health reasons would prevent her from taking custody of [H.H.]." (June 25, 2020 Decision at 5-6.) Therefore, based on the facts and circumstances of this case, we find the magistrate's decision and the juvenile court's decision overruling J.H.'s objection demonstrate the court satisfied its duty to consider the best-interest factor under R.C. 2151.414(D)(1)(b).

### 3. Custodial History

{¶ 39} The third factor in determining whether an order granting PPLA is in the child's best interest requires considering the child's custodial history, including whether they have been in the temporary custody of a public service agency for 12 or more months of a consecutive 22-month period. R.C. 2151.414(D)(1)(c).

{¶ 40} The magistrate found that "FCCS was given temporary custody by this Court on August 17, 2017 after the expiration of a 30-day agreement between [J.H.] and FCCS due to [H.H.] mental health concerns. [H.H.] was placed at Genacross, near Toledo, for residential treatment under the 30-day agreement in July 2017 and has remained there since." (Jan. 27, 2020 Mag.'s Decision at 2.) In its decision overruling J.H.'s objection, the juvenile court found that "[o]n July 20, 2017, [J.H.] voluntarily entered into a thirty day Temporary Order of Custody to [FCCS]. [H.H.] was placed in Genacross, a residential facility located in Whitehouse, Ohio where she remains today. On January 22, 2018,

Temporary Court Custody was granted to FCCS and [H.H.] was to remain at Genacross." (June 25, 2020 Decision at 5.) Therefore, we find the magistrate's decision and the juvenile court's decision overruling J.H.'s objection demonstrate the court satisfied its duty to consider the best-interest factor under R.C. 2151.414(D)(1)(c).

### 4. Provision of a Legally Secure Permanent Placement

{¶ 41} The fourth factor in determining whether an order granting PPLA is in the child's best interest requires considering the child's need for a legally secure placement and whether that type of placement can be achieved without a grant of PPLA to a public agency. R.C. 2151.414(D)(1)(d). The magistrate found returning H.H. to J.H.'s custody would not be in H.H.'s best interest for the following reasons:

> The core component of the case plan for [J.H] was for him to be involved in [H.H.'s] treatment and therefore learn [H.H.'s] needs. This has not happened. Initially, [J.H.] has only visited with [H.H.] three (3) times during [H.H.'s] stay at Genacross despite FCCS efforts to arrange visits. [J.H.] has also not participated in any treatment meetings with Genacross or attended any of the three (3) Individualized Education Plan (IEP) meetings held regarding [H.H.]. His lack of understanding of [H.H.'s] needs is demonstrated in his testimony that [H.H.] is simply undermedicated, while those closely involved in [H.H.'s] treatment (Genacross, FCCS, and the GAL) all testified to [H.H.'s] need for structured residential treatment.
>
> FCCS has made reasonable efforts to prevent [H.H.'s] removal from home. FCCS has attempted to engage [J.H.] in [H.H.'s] treatment. Returning [H.H.] home was considered, but not an option given [J.H.'s] demonstrated lack of understanding of [H.H.'s] needs and the recommendation for residential treatment. Placement and casework services were provided by [FCCS] to the family of [H.H.], but the removal of [H.H.] from home continues to be necessary because the circumstances giving rise to the original filing have not been sufficiently alleviated.

(Jan. 27, 2020 Mag.'s Decision at 2.) Furthermore, the magistrate found that "[H.H.], because of mental health needs, is unable to function in a family-like setting and must remain in residential care." (June 25, 2020 Decision at 3.)

{¶ 42} In its decision, the juvenile court found that "FCCS considered all other possible dispositions." (June 25, 2020 Decision at 15.) Regarding the possibility of

returning H.H. to J.H.'s custody, the court found that "[J.H.] has not engaged with [H.H.'s] medical providers or those involved with [H.H.'s] educational planning since [H.H.] was admitted to Genacross. Therefore, [J.H.] does not have sufficient understanding of [H.H.'s] medical, mental health and educational needs." (June 25, 2020 Decision at 16.) Furthermore, the juvenile court found that "[d]ue to [H.H.'s] mental and psychological needs as stated in the findings of fact herein, the evidence overwhelmingly reflects that [H.H.] cannot function in a family like setting and residential treatment is in [H.H.'s] best interest." (June 25, 2020 Decision at 15-16.)   Based on "detailed accounts of [H.H.'s] disturbances and behaviors and the care necessary to keep [H.H.] and those around her safe" provided by "qualified professionals," the court concluded that "[t]he evidence is overwhelming that [PPLA] is in the best interest of [H.H.]." (June 25, 2020 Decision at 17.) Therefore, we find the magistrate's decision and juvenile court's decision overruling J.H.'s objection demonstrate the court satisfied its duty to consider the best-interest factor under R.C. 2151.414(D)(1)(d).

### 5. Other Factors

{¶ 43} The fifth factor in determining whether an order granting PPLA is in the child's best interest requires considering whether any of the factors listed in R.C. 2151.414(E)(7) through (11) apply. R.C. 2151.414(D)(1)(e). J.H. argues it was not "fundamentally fair" for the juvenile court to not acknowledge this factor. (J.H.'s Brief at 38.)  Although the juvenile court did not specifically cite any of the R.C. 2151.414(E)(7) through (11) factors, we have previously stated that "[d]ue to the nature of the factors set forth in R.C. 2151.414(E)(7) to (11), they will not apply in every case." *L.W.* at ¶ 32. This court has affirmed decisions finding a grant of custody to an agency to be in a child's best interest without explicit consideration of those factors where they did not apply, or decisions where the juvenile court only considered certain of the R.C. 2151.414(E)(7) to (11) factors that were applicable to the particular case. *Id. See In re J.A.G.*, 10th Dist. No. 08AP-823, 2009-Ohio-821, ¶ 16, fn.1 ("The trial court did not consider the fifth R.C. 2151.414(D) factor as the factors [found] in R.C. 2151.414(E)(7) to (11) do not apply to J.R.G. and her children."); *In re J.S.*, 10th Dist. No. 05AP-615, 2006-Ohio-702, ¶ 32 (juvenile court magistrate found that only R.C. 2151.414(E)(10) factor applied to the case and juvenile court did not err by considering that factor); *In re M.R.D.*, 10th Dist. No. 05AP-324, 2005-Ohio-

5705, ¶ 30 (holding that most of the factors contained in R.C. 2151.414(E)(7) to (11) did not apply under the facts of the case and there was some evidence that some of the parent's children had been involuntarily removed from her care). Here, the record does not reflect that any of the factors listed in R.C. 2151.414(E)(7) through (11) apply, and no party has argued otherwise. Therefore, as the factors under R.C. 2151.414(E)(7) through (11) were inapplicable to the matter at hand, we cannot find in this instance that the court's failure to make findings regarding those factors is prejudicial error. *See In re D.S.*, 10th Dist. No. 07AP-479, 2007-Ohio-6781, ¶ 13 ("It is not prejudicial for a court to fail to mention or consider factors that are irrelevant to the case at hand."); *A.M.* at ¶ 36.

{¶ 44} Accordingly, we overrule J.H.'s sole assignment of error.

## IV. Conclusion

{¶ 45} Having overruled J.H.'s sole assignment of error, we affirm the June 25, 2020 decision and judgment entry of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch.

*Judgment affirmed.*

SADLER and LUPER SCHUSTER, JJ., concur.