[Cite as *In re Y.G.*, 2026-Ohio-267.]

# COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

IN RE Y.G., ET AL.        :

                         :         No. 115538

Minor Children         :

                         :

[Appeal by Mother]     :

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** January 29, 2026

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case Nos. AD23902127, AD23902128, AD23902129,
AD23902130, AD23902131, and AD23902132

---

***Appearances:***

Sylvester Summers, Jr., Co., LPA and Sylvester Summers,
Jr., *for appellant*.

Michael C. O'Malley, Cuyahoga County Prosecuting
Attorney, and Joseph C. Young, Assistant Prosecuting
Attorney, *for appellee* CCDCFS.

EILEEN T. GALLAGHER, P.J.:

{¶ 1} Appellant-Mother appeals six judgments of the Cuyahoga County Common Pleas Court, Juvenile Division, granting permanent custody of three of her minor children to the Cuyahoga County Division of Children and Family Services ("CCDCFS" or "the agency"), granting legal custody of two of her children to two

separate individuals, and ordering one of her children to be placed in a planned permanent-living arrangement ("PPLA"). She claims the following error:

> The trial court erred in awarding permanent custody to the Cuyahoga County Department of Children and Family Services ("CCDCS") and relatives of the children as CCDCFS failed to show by clear and convincing evidence that adequate grounds existed for a grant of permanent custody and therefore such decision was contrary to the manifest weight of the evidence.

{¶ 2} We find that the juvenile court's judgments are not against the manifest weight of the evidence. We, therefore, affirm the juvenile court's judgments.

## I. Facts and Procedural History

{¶ 3} On February 16, 2023, CCDCFS filed complaints alleging that Mother's six children, Y.G., L.G., T.G., A.G., Jayc.G., and Jayv.G. (collectively "Children"), were neglected and requesting dispositional orders of temporary custody. On March 1, 2023, the juvenile court issued orders placing the Children in the emergency custody of CCDCFS. On May 21, 2023, the juvenile court determined that the Children were neglected and ordered them to be placed in the temporary custody of CCDCFS.

{¶ 4} On January 18, 2024, CCDCFS filed motions to modify temporary custody of the Children to more permanent dispositions. While the motions were pending, the parties twice agreed to extend temporary custody. However, on December 24, 2024, CCDCFS filed a motion to modify temporary custody of Y.G. to a PPLA. It also filed motions to modify temporary custody of T.G. to the legal custody of a paternal aunt and to modify temporary custody of L.G. to the legal

custody of an interested party. Finally, CCDCFS filed a motion to modify the temporary custody of A.G., Jayc.G., and Jayv.G. to the permanent custody of CCDCFS. The juvenile court conducted a two-day trial on the motions on August 6, 2025, and August 8, 2025.

{¶ 5} LaGina White ("White"), a child-protection specialist with CCDCFS who was assigned Mother's cases, testified that the Children were originally removed from Mother's custody because Mother was unable to meet the Children's basic needs, her housing conditions were "deplorable," and Mother had substance-abuse issues. (Aug. 6, 2025, tr. 11.) White explained that Mother's home had trash on the floor, holes in the wall that needed to be repaired, tobacco and cigar wrappings on the floor, and the babies were lying on a soiled mattress. (Aug. 6, 2025, tr. 18-19.)

{¶ 6} Following the Children's removal, the agency developed a case plan for Mother with the goal of reunification. The case-plan objectives included services to address Mother's substance-abuse, parenting, housing, and domestic-violence issues. In an effort to achieve the objectives, the agency referred Mother to several substance-abuse programs through Recovery Resources, New Visions, and Legends. (Aug. 6, 2025, tr. 14.) Although Mother participated in these programs, she did not complete them successfully because she repeatedly tested positive for cocaine and also tested positive for alcohol. (Aug. 6, 2024, tr. 14.) White explained that Mother was referred to New Visions as an inpatient because she did not successfully

complete either the outpatient programs or the partial hospitalization program. (Aug. 6, 2025, tr. 15.)

**{¶ 7}** Mother completed a "nurturing parenting program" and a domestic-violence program. (Aug. 6, 2025, tr. 16-17.) However, according to White, Mother did not demonstrate any benefit from these programs because two additional children were removed from Mother's custody after she completed the program because she continued to have a relationship with someone who committed domestic violence, and the agency determined that the children were not safe in that environment. (Aug. 6, 2025, tr. 16-18.) Regarding domestic violence, White testified "there had been incidents of violence in [Mother]'s home" and that she (White) had observed broken items that belonged to the Children and holes in the walls caused by Mother's boyfriend. (Aug. 6, 2025, tr. 17-18.)

**{¶ 8}** When asked whether Mother had appropriate housing for the Children, White explained that Mother has her own apartment but "there's inconsistency with the conditions." (Aug. 6, 2025, tr. 18.) When White last viewed the apartment before trial it was "appropriate," but there were other times when it was "deplorable." (Aug. 6, 2025, tr. 18-19.)

**{¶ 9}** The agency developed case plans for each of the Children's fathers. However, paternity was not established for one of the three fathers, and the agency was unable to contact another one of the fathers. (Aug. 6, 2025, tr. 19-20.) Although the agency made contact with the third father, he failed to complete any of the case-plan objectives, which included domestic-violence and parenting programs. When

his case worker attempted to discuss the case-plan goals, he told the worker, "I don't want it, so you can stop asking me about it." (Aug. 6, 2025, tr. 54.)

{¶ 10} Mother's case plan included visitation with the Children. However, her visits were inconsistent. According to White, Mother was ultimately removed from the parenting program because she had "too many no-call/no shows." (Aug. 6, 2025, tr. 25.) Following Mother's removal from the program, there was no set schedule for visitation. White talked to Mother about setting up a visitation schedule, and Mother told her not to set a schedule because she was preparing to enter an inpatient rehabilitation facility for several months. (Aug. 6, 2025, tr. 25.) At the time of the August 6, 2025 trial, Mother had not visited either Y.G or T.G. since March 2025. (Aug. 6, 2025, tr. 26.) And Mother only visited the other children "sporadically." (Aug. 6, 2025, tr. 24 and 26.)

{¶ 11} White testified that Y.G., who has both cognitive and physical disabilities, was placed in certified foster care and was receiving services from the Cuyahoga County Board of Developmental Disabilities. At the time of trial, Y.G. had been with the certified foster family for 12-18 months. White testified that the agency had no issues with Y.G.'s placement. (Aug. 6, 2025, tr. 21.)

{¶ 12} T.G. had previously been in a residential-treatment placement because of her behaviors. However, at the time of trial, she was living with a paternal aunt, and her behavioral issues appeared to have resolved. T.G. is engaged in counseling at MetroHealth and she is receiving psychiatric treatment for ADHD. (Aug. 6, 2025, tr. 26-27.)

{¶ 13} A.G., Jayc.G., and Jayv.G. were living together in the home of a paternal aunt. (Aug. 6, 2025, tr. 22-23.) At the time of trial, L.G. was living with a nonrelative where she had been since she was initially removed from Mother's custody in March 2023. White testified that the Children were all doing well in their respective placements and that their needs were being met. (Aug. 6, 2025, tr. 22-24.) Although the Children were living in different homes, they visited each other once a week, except for T.G., whose visits were less frequent. (Aug. 6, 2025, tr. 51.)

{¶ 14} During White's testimony, the court expressed a desire to review a "Memorandum of Understanding" by the proposed legal custodians of T.G. The court also ordered White to go to Mother's home and photograph the condition of her home so the court would have that information when rendering its decision. (Aug. 6, 2025, tr. 62-63.) By that time, CCDCFS had concluded its case-in-chief, and no other witnesses were called by any party. Before adjourning, the trial court addressed the proposed custodians for T.G. and L.G., and they confirmed their intention to become the legal custodians for those children.

{¶ 15} The trial resumed on August 8, 2025, and photographs of Mother's residence were provided to the court. (Aug. 8, 2025, tr. 79.) The Children's guardian ad litem ("GAL") also stated his recommendation on the record. The GAL stated that he and White visited Mother's home after the first day of trial, and he found that her home was "not ready for any kids[.]" He explained:

There's no beds in the apartment. There's no place for the kids to sleep.

Although there is enough room for the kids and the mom was making efforts to keep it clean, it wasn't adequate for children at the time we visited, and this is over two years down the road.

So my recommendation remains what it was in my written report, that the three kids [Jayc.G., Jayv.G. and A.G.], that they go into permanent custody.

Y.G. should go into PPLA. She's doing very well. She's been with the same foster mother for I think over two years now.

T.G. is doing very well now. She spent a long time far away from home in Belmont Pines and she was finally released and she's doing very well in her placement.

And the three kids that are being asked for permanent custody, they are doing excellently.

They all do say that they want to see more of their parents and that's something I encourage their parents to continue to do.

However, my recommendation remains what it was when I submitted the written recommendation in June.

(Aug. 8, 2025, tr. 81.)

{¶ 16} Based on the evidence and testimony presented at trial, the trial court issued a decision (1) ordering that Y.G. be placed in a PPLA; (2) ordering that T.G. and L.G. be placed in the legal custody of their respective caregivers; and (3) ordering that A.G., Jayc.G., and Jayv.G. be placed in the permanent custody of CCDCFS.

{¶ 17} Mother now appeals the trial court's judgment and argues, in her sole assignment of error, that the trial court's judgment is against the manifest weight of the evidence.

## II. Law and Analysis

{¶ 18} We take our responsibility reviewing the termination of parental rights and the award of permanent custody very seriously. A parent has a "fundamental liberty interest . . . in the care, custody, and management of [his or her child]." *Santosky v. Kramer*, 455 U.S. 745, 753 (1982). The termination of parental rights is regarded as "'the family law equivalent of the death penalty in a criminal case.'" *In re J.B.*, 2013-Ohio-1704, ¶ 66 (8th Dist.), quoting *In re Hoffman*, 2002-Ohio-5368, ¶ 14. Thus, parents "'must be afforded every procedural and substantive protection the law allows.'" *In re Hayes*, 79 Ohio St.3d 46, 48 (1997), quoting *In re Smith*, 77 Ohio App.3d 1, 16 (6th Dist. 1991).

{¶ 19} Nevertheless, a parent's right to the care and custody of his or her child is not absolute. *In re L.G.*, 2022-Ohio-529, ¶ 49 (8th Dist.). "'[T]he natural rights of a parent . . . are always subject to the ultimate welfare of the child, which is the polestar or controlling principle to be observed.'" *In re L.D.*, 2017-Ohio-1037, ¶ 29 (8th Dist.), quoting *In re Cunningham*, 59 Ohio St.2d 100, 106 (1979).

{¶ 20} All children have "'the right, if possible, to parenting from either natural or adoptive parents which provides support, care, discipline, protection and motivation.'" *In re J.B.*, at ¶ 66, quoting *In re Hitchcock*, 120 Ohio App.3d 88, 102 (8th Dist. 1996). When parental rights are terminated, the goal is to create "a more stable life" for dependent children and to "facilitate adoption to foster permanency for children." *In re N.B.*, 2015-Ohio-314, ¶ 67 (8th Dist.), citing *In re Howard*, 1986 Ohio App. LEXIS 7860, 5 (5th Dist. Aug. 1, 1986).

{¶ 21} Ohio statutes governing child custody and protection "'appropriately reflect the need to balance . . . [the] parents' . . . interest in the custody, care, nurturing, and rearing of their own children, and the State's parens patriae interest in providing for the security and welfare of children under its jurisdiction[.]'" *In re P.S.*, 2023-Ohio-144, ¶ 26 (8th Dist.), quoting *In re Thompson*, 2001 Ohio App. LEXIS 1890 (10th Dist. Apr. 26, 2001).

## A. Standard of Review

{¶ 22} R.C. 2151.414 provides a two-prong analysis to be applied by a juvenile court in adjudicating a motion for permanent custody. *In re S.C.*, 2018-Ohio-2523, ¶ 20 (8th Dist.), citing R.C. 2151.414(B). The first prong authorizes the juvenile court to grant permanent custody of a child to the public agency if, after a hearing, the court determines, by clear and convincing evidence, that any of the following factors apply: (a) the child is not abandoned or orphaned, but the child cannot be placed with either parent within a reasonable time or should not be placed with the child's parents; (b) the child is abandoned; (c) the child is orphaned, and there are no relatives of the child who are able to take permanent custody; (d) the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for 12 or more months of a consecutive 22-month period; or (e) the child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this State or another State. R.C. 2151.414(B)(1)(a)-(e).

{¶ 23} "Only one of the factors must be present to satisfy the first prong of the two-part analysis for granting permanent custody to an agency." *In re D.H.*, 2021-Ohio-3821, ¶ 27 (8th Dist.), citing *In re L.W.*, 2017-Ohio-657, ¶ 28 (8th Dist.).

{¶ 24} In accordance with the second prong of R.C. 2151.414, when any one of the above factors exists, the juvenile court must then consider the factors listed in R.C. 2151.414(D) to determine, by clear and convincing evidence, whether it is in the child's best interest to grant permanent custody to the agency pursuant to R.C. 2151.414(D). *In re H.G.,* 2024-Ohio-3408, ¶ 16 (8th Dist.).

{¶ 25} "'Clear and convincing evidence' is evidence that 'will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established.'" *In re T.B.,* 2014-Ohio-2051, ¶ 28 (8th Dist.), quoting *Cross v. Ledford*, 161 Ohio St. 469, 477 (1954).

{¶ 26} Given that R.C. 2151.414 requires a juvenile court to find by clear and convincing evidence that the statutory requirements are met, the Ohio Supreme Court has held that "the sufficiency-of-the-evidence and/or manifest-weight-of-the-evidence standards of review are the proper appellate standards of review of a juvenile court's permanent-custody determination, as appropriate depending on the nature of the arguments that are presented by the parties." *In re Z.C.*, 2023-Ohio-4703, ¶ 11.

{¶ 27} As previously stated, Mother argues the trial court's judgments awarding permanent custody of A.G., Jayc.G., and Jayv.G. to CCDCFS, ordering Y.G.

into a PPLA, and placing T.G. and L.G. in the legal custody of their respective caregivers is against the manifest weight to the evidence.

{¶ 28} The Ohio Supreme Court articulated the manifest-weight standard of review in *In re Z.C.*:

> When reviewing for manifest weight, the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered. [*Id.* at ¶ 20.] "In weighing the evidence, the court of appeals must always be mindful of the presumption in favor of the finder of fact." *Id.* at ¶ 21. "The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). "'If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment.'" *Id.* at fn. 3, quoting 5 Ohio Jurisprudence 3d, Appellate Review, Section 603, at 191-192 (1978).

*Id.* at ¶ 14.

## B. First Prong — R.C. 2151.414(B)

{¶ 29} The juvenile court found, pursuant to R.C. 2151.414(B)(1)(a), that although Y.G. is not abandoned or orphaned, she could not be placed with either parent within a reasonable time or should not be placed with either parent. With respect to T.G., L.G., A.G., Jayc.G., and Jayv.G., the juvenile court found, pursuant to R.C. 2151.414(B)(1)(d) that, at that time of trial in August 2025, they had been in the temporary custody of the CCDCFS since May 23, 2023. In other words, the

juvenile court found that the Children had been in temporary custody for over two years.  Indeed, the undisputed evidence showed that all the Children had been in uninterrupted agency custody for over two years.

{¶ 30} The evidence showed that Mother regularly failed to maintain sobriety throughout the proceedings and that she was unable to provide a proper home for the Children during the two-year period that the agency assisted her in meeting her case-plan objectives.  She also continued a relationship with a violent boyfriend after completing a program designed to address domestic violence.  Placing the Children with Mother while there was an ongoing threat of domestic violence would have placed the Children in a dangerous environment.  Furthermore, none of the Children's fathers engaged in their case-plan services.  Therefore, the evidence supported the trial court's findings under R.C. 2151.414(B)(1)(a) and 2151.414(B)(1)(d) and those findings were sufficient to satisfy the first prong of the permanent-custody analysis.

## C. Second Prong — Best Interest of the Child

{¶ 31} Having determined that the juvenile court's findings under R.C. 2151.414(B)(1)(a) and 2151.414(B)(1)(d) were sufficient to satisfy the first prong of the permanent-custody analysis, we now turn to the second prong of our analysis which requires us to determine, by clear and convincing evidence, whether the orders (1) placing Y.G. into a PPLA; (2) ordering T.G. and L.G. into the legal custody of their respective caregivers; and (3) ordering that A.G., Jayc.G., and Jayv.G. be placed in the permanent custody of CCDCFS are in the Children's best interests.

{¶ 32} In determining the best interest of the child, a juvenile court may apply one of two different tests set forth in R.C. 2151.414(D)(1) and (D)(2). *In re A.F.,* 2023-Ohio-4423, ¶ 41 (8th Dist.), citing *In re S.C.,* 2022-Ohio-356, ¶ 38 (10th Dist.), quoting *In re J.P.,* 2019-Ohio-1619, ¶ 39 (10th Dist.). In this case, the juvenile court appears to have found that permanent custody was in the Children's best interest under R.C. 2151.414(D)(1).

{¶ 33} In determining the best interest of a child under R.C. 2151.414(D)(1), the juvenile court must consider all relevant factors, including but not limited to (1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster parents, and out-of-home providers, and any other person who may significantly affect the child; (2) the wishes of the child as expressed directly by the child or through the child's guardian ad litem; (3) the custodial history of the child; (4) the child's need for a legally secure placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any factors in R.C. 2151.414(E)(7) through (11) are applicable.

{¶ 34} Although a trial court is required to consider each of the R.C. 2151.414(D)(1) factors in making its permanent-custody determination, "R.C. 2151.414(D)(1) does not require a juvenile court to expressly discuss each of the best-interest factors in R.C. 2151.414(D)(1)(a) through (e)." *In re A.M.,* 2020-Ohio-5102, ¶ 31. "Consideration is all the statute requires." *Id.*

{¶ 35} In analyzing the best-interest factors listed in R.C. 2151.414(D)(1)(a), "there is not one element that is given greater weight than the others pursuant to the

statute." *In re Schaefer*, 2006-Ohio-5513, ¶ 56. Moreover, only one factor needs to be resolved in favor of permanent custody in order to find that permanent custody is in the child's best interest. *In re S.C.*, 2015-Ohio-2410, ¶ 30 (8th Dist.).

### 1. Permanent Custody of A.G., Jayc.G., and Jayv.G.

{¶ 36} The juvenile court appears to have found that permanent custody was in A.G., Jayc.G., and Jayv.G.'s best interests based on the best-interest factors set forth in R.C. 2151.414(D)(1). The court stated in its judgment entries that it based its decision on the Children's relationships with their family members and caregivers, the custodial history of the Children, the Children's need for a secure permanent placement, and the recommendation of the GAL, that permanent custody was in the Children's best interests. The evidence supports the juvenile court's findings.

{¶ 37} The undisputed evidence showed that the Children had been in uninterrupted agency custody for over two years and that despite having over two years to work on her case plan, Mother failed to remedy the conditions that originally led to the Children's removal. She failed to benefit from domestic-violence counseling and parenting services because she continued a relationship with a violent boyfriend after completing those programs. She also failed to provide a home that could accommodate the Children. Moreover, Mother failed to consistently visit the Children. After two years of temporary custody, these Children need a secure, permanent home, and Mother has failed to provide one. The GAL opined that, under these circumstances, permanent custody was in the Children's

best interests. Therefore, the trial court's finding that permanent custody was in the Children's best interests is supported by the manifest weight of the evidence.

## 2. PPLA for Y.G.

{¶ 38} The juvenile court found it was in Y.G.'s best interest to be placed in a PPLA. R.C. 2151.353(A)(5) provides that a juvenile court may order a child to be placed in a PPLA when:

> [A] public children services agency or private child placing agency requests the court to place the child in a planned permanent living arrangement and if the court finds, by clear and convincing evidence, that a planned permanent living arrangement is in the best interest of the child, that the child is sixteen years of age or older, and that one of the following exists:
>
> (a) The child, because of physical, mental, or psychological problems or needs, is unable to function in a family-like setting and must remain in residential or institutional care now and for the foreseeable future beyond the date of the dispositional hearing held pursuant to section 2151.35 of the Revised Code.
>
> (b) The parents of the child have significant physical, mental, or psychological problems and are unable to care for the child because of those problems, adoption is not in the best interest of the child, as determined in accordance with division (D)(1) of section 2151.414 of the Revised Code, and the child retains a significant and positive relationship with a parent or relative.
>
> (c) The child has been counseled on the permanent placement options available to the child, and is unwilling to accept or unable to adapt to a permanent placement.

*See also* R.C. 2151.415(C)(1). Thus, in order to place a child in a PPLA, the juvenile court must find, by clear and convincing evidence, that a PPLA is in the best interest of the child, the child is at least 16 years old, and that one of the specified conditions

exist. *In re H.H. J.H.*, 2021-Ohio-1732, ¶ 31 (10th Dist.), citing *In re A.B.*, 2006-Ohio-4359, ¶ 33.

{¶ 39} Y.G. was 17 years old at the time of trial. (*See* GAL Reports and Recommendations.) White's uncontroverted testimony established that Y.G. suffers from developmental disabilities and a low IQ. According to the GAL, Y.G. "is in special needs classes due to her severe autism and needs to be linked to the Board of Developmental Disabilities so that she can transition to their services when she is emancipated." (June 23, 2025, GAL Report and Recommendation.) Thus, the evidence shows that Y.G. was eligible for placement in a PPLA because she was older than 16 years old at the time of trial and her developmental disabilities met the conditions specified in the statute. And Mother has failed to demonstrate that she is capable of meeting Y.G.'s special needs. Therefore, the court's finding that it is in Y.G.'s best interest to be placed in a PPLA is supported by the manifest weight of the evidence.

### 3. Legal Custody of T.G. and L.G.

{¶ 40} Finally, the juvenile court found that it was in T.G.'s best interest to be placed in the legal custody of a paternal aunt and that it was in L.G.'s best interest to be placed in the legal custody an interested individual. R.C. 2151.353(A)(3) allows a court to place a child in the legal custody of an individual if it finds, by a preponderance of the evidence, that such disposition is in the child's best interest. *See In re K.C.*, 2025-Ohio-5047, ¶ 24 (8th Dist.).

{¶ 41} "Legal custody" refers to "a legal status that vests in the custodian the right to have physical care and control of the child and to determine where and with whom the child shall live, and the right and duty to protect, train, and discipline the child and to provide the child with food, shelter, education, and medical care, all subject to any residual parental rights, privileges, and responsibilities." R.C. 2151.011(B)(21). Legal custody is meant to be permanent in nature. R.C. 2151.42(B). However, it differs from a termination of parental rights in that the parent who loses legal custody of a child "retains residual parental rights, privileges and responsibilities." *In re C.R.*, 2006-Ohio-1191, ¶ 17. Thus, when a child is placed in legal custody, the parent is not permanently foreclosed from regaining custody. *Id.*

{¶ 42} R.C. 2151.353(A)(3) does not set forth best-interest factors for the court to consider. *In re S.S.*, 2025-Ohio-842, ¶ 38 (8th Dist.); *In re P.V.A.*, 2023-Ohio-1622, ¶ 16 (11th Dist.). "Nevertheless, this court has held that the R.C. 2151.414(D) best-interest factors may be 'instructive' in making that determination." *In re S.S.* at ¶ 38, citing *In re V.P.*, 2020-Ohio-5626, ¶ 32 (8th Dist.); *In re D.T.*, 2014-Ohio-4818, ¶ 20 (8th Dist.), citing *In re E.A.*, 2013-Ohio-1193, ¶ 13 (8th Dist.).

{¶ 43} As previously stated, the best-interest factors listed in R.C. 2151.414(D) include the interaction of the child with the child's parents, relatives, caregivers, and any other person who may significantly affect the child; the wishes of the child, as expressed directly by the child or through the child's guardian

ad litem; the custodial history of the child; and the child's need for a legally secure permanent placement. R.C. 2151.414(D).

{¶ 44} The juvenile court found that legal custody was in T.G.'s and L.G.'s best interests based on the best-interest factors outlined in R.C. 2151.414(D). And, as with the other Children, the evidence shows that T.G. and L.G. have been in uninterrupted agency custody for over two years and that they need a secure, permanent placement. And the GAL recommended that they be placed in legal custody. Indeed, the GAL noted in his report and recommendation that T.G. "is very happy [in her placement] with [ ] her paternal grandmother" and that L.G. was doing well in her placement with her godmother, where she was placed with her two younger twin siblings, who are not involved in this appeal. Thus, the trial court's findings under R.C. 2151.414(D) that legal custody was in the Children's best interests are supported by the manifest weight of the evidence.

{¶ 45} The juvenile court's judgments awarding permanent custody of A.G., Jayc.G., and Jayv.G. to CCDCFS, granting legal custody of T.G. and L.G. to their respective caregivers, and placing Y.G. in a PPLA are supported by the manifest weight of the evidence. Accordingly, the sole assignment of error is overruled.

{¶ 46} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27

of the Rules of Appellate Procedure.

_____
EILEEN T. GALLAGHER, PRESIDING JUDGE

MICHAEL JOHN RYAN, J., and
EILEEN A. GALLAGHER, J., CONCUR