[Cite as *In re J.T.*, 2022-Ohio-4747.]

# COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

|                           |   |              |
|---------------------------|---|--------------|
| IN RE J.T.                | : |              |
|                           | : | No. 111642   |
| A Minor Child             | : |              |
|                           | : |              |
| [Appeal by J.H.T., Father] | : |              |

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** December 29, 2022

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. AD-21900593

### *Appearances:*

Valore & Gordillo LLP and Dean M. Valore, *for appellant*.

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Joseph C. Young, Assistant Prosecuting Attorney, *for appellee* CCDCFS.

EILEEN T. GALLAGHER, J.:

{¶ 1} Appellant-father, J.H.T. ("Father"), appeals from the juvenile court's order awarding legal custody of the minor child, J.T., to the child's maternal grandmother, H.A.W. ("Maternal Grandmother"). Father raises the following assignment of error for review:

The trial court's findings that it was in the best interests of the child to be placed in the legal custody of a relative is against the manifest weight of the evidence.

{¶ 2} After careful review of the record and relevant case law, we affirm the juvenile court's judgment.

## Procedural and Factual History

{¶ 3} Father and S.A. ("Mother")[1] are the biological parents of the minor child, J.T., born June 29, 2012.

{¶ 4} On January 25, 2021, the Cuyahoga County Division of Children and Family Services ("CCDCFS" or the "agency") filed a complaint alleging that J.T. was a dependent child as defined under R.C. 2151.04(B) and (C). The complaint set forth the following particulars:

1. Father is displaying aggressive, erratic, and delusional behaviors. Father's untreated mental health issues prevent him from providing a safe home for the child.

2. The child has been residing with [Maternal Grandmother] for approximately one week. When the parents attempted to remove him from [Maternal Grandmother], the child began experiencing significant behavior issues and refused to return to the home. The child has displayed significant fear of returning to the care of the parents.

3. Mother has failed to ensure the child's safety. Mother has continued to reside with Father and allowed him continual access to the child despite knowing Father's mental-health issues.

4. Mother and Father have repeatedly engaged in physical altercations in the presences of the child.

---

[1] Mother is not a party to this appeal.

5. An investigation is currently pending regarding sexual-abuse allegations of the child [against] Father. Father was previously convicted of attempted unlawful sexual conduct with a minor.

{¶ 5} On the same day, the juvenile court granted CCDCFS predispositional temporary custody and committed the child to the emergency care and custody of the agency. The child's placement with Maternal Grandmother was ordered to continue.

{¶ 6} On February 19, 2021, CCDCFS developed a case plan to assist Mother and Father in addressing the issues that led to the child's removal from their care. Father's case plan required him to complete a mental-health assessment and "actively participate and complete any treatment recommendation." In addition, Father and Mother were each required to participate in counseling and successfully complete domestic violence and parenting-education programs.

{¶ 7} On April 6, 2021, the agency amended its original complaint to remove the allegation that a sexual-abuse investigation was pending against Father.

{¶ 8} On May 3, 2021, the juvenile court determined that the first, second, and fifth allegations of the amended complaint were proven by clear and convincing evidence. The court further found:

> The child lacks adequate parental care by reason of the mental or physical condition of the child's parents, guardian or custodian; the child's condition or environment is such as to warrant the state, in the interest of the child, in assuming the child's guardianship because of the existence of the following dangers or underlying family problems: The Father has displayed erratic and delusional behavior. The child has developed significant fear of returning to the care of the parents.

Accordingly, the child was adjudicated dependent, and the court's predispositional temporary custody order was continued in effect.

{¶ 9} A dispositional hearing was held on May 10, 2021. On June 15, 2021, the juvenile court issued a judgment entry awarding CCDCFS temporary custody of J.T., stating, in relevant part,

> Upon due consideration, it is ordered that the previous order of this court committing the child to the predispositional temporary custody of [CCDCFS] pursuant to Juvenile Rule 13 is terminated. The child is committed to the temporary custody of [CCDCFS].

{¶ 10} On August 25, 2021, Mother filed a motion for legal custody, arguing that "the best interest of the child would be served by awarding her legal custody." In support of her motion, Mother maintained that she (1) "complied with her case plan services," (2) "has a stable home and is able to care for the child," and (3) "has faithfully visited with [J.T.] and strongly desires time with her child on a permanent, day-to-day basis."

{¶ 11} On November 29, 2021, the agency filed a motion to modify temporary custody to legal custody to Maternal Grandmother pursuant to R.C. 2151.353(F)(2) and 2151.415. In the motion, CCDCFS argued that it was in the child's best interests to award Maternal Grandmother legal custody of the child, stating,

> Legal custody is an appropriate disposition for the child because, prior to filing this motion, CCDCFS developed a case plan to facilitate reunification, however, the mother and father have failed to complete the objectives of the case plan so as to reduce the risk so the child can return home. Specifically, CCDCFS referred mother and father to parenting classes and father to a mental health assessment. Mother and father completed a parenting class and father completed a mental health assessment but was not truthful regarding the reason he was

referred. Mother and father have not demonstrated a benefit from the services offered and remain unable to provide a safe and permanent home for the child. [Maternal Grandmother] is able to provide for the needs of the child on a daily basis and is willing to provide a permanent home for the child.

{¶ 12} On March 25, 2022, Father filed his own motion for legal custody, arguing that he was "ready, willing, and able to provide for and take care of the child."

{¶ 13} A hearing was held before a magistrate on April 5, 2022, to resolve the pending motions for legal custody. On behalf of CCDCFS, Rachael McLaughlin ("McLaughlin"), a psychiatric-nurse practitioner at Signature Health, Inc., testified that she completed a mental-health evaluation of Father in February 2022. McLaughlin described Father as manic, with grandiose and paranoid ideations. Given her limited time with Father, however, McLaughlin was unable to render a complete diagnostic conclusion, stating:

> So at the end of [the evaluation], the impression was unclear with an hour appointment, [I was] still trying to distinguish between bipolar disorder versus the delusional disorder. We did go ahead and make a recommendation to try a medication to maybe help with [Father's] racing thoughts, disorganized thoughts that were difficult for myself to follow, although [Father] did not seem very disrupted by these symptoms.

> He was hesitant at first, but he was willing to try a medication to see if it helped him communicate with others. * * * But it wasn't specifically prescribed to him for a diagnosis of psychosis or a diagnosis of [a] mood disorder.

(Tr. 17). McLaughlin later clarified that Father was prescribed the drug Abilify to address any impairments in communication, rapid speech, and mood.

**{¶ 14}** During Father's follow-up appointment with McLaughlin, he indicated that he was no longer taking his prescribed medication due to its side effects. McLaughlin testified that Father continued to show signs of "significant distress, again mostly related to his current case with [CCDCFS]." (Tr. 21.) However, McLaughlin determined that it was unnecessary to make further recommendations because Father did not fully meet the criteria for bipolar disorder.

**{¶ 15}** On cross-examination, McLaughlin confirmed that she did not observe Father with J.T. and, therefore, could not speak to Father's ability to care for the child. McLaughlin further testified that she did not believe Father's delusional thoughts impaired his relationship with J.T. Finally, McLaughlin testified that there were no indications that Father posed a threat of harm or danger to the child.

**{¶ 16}** Extended Service Worker, Kenni Tolliver ("Tolliver"), testified that she was assigned to the child's case in August 2021. She explained the scope of the parents' case plans for reunification, including Father's obligation to address concerns relating to parenting, domestic violence, and mental health. With respect to the parenting component of the case plans, Tolliver explained that the agency had concerns with the parents' means of discipline, including reports that J.T. "was locked in a room for longer than appropriate periods of time." (Tr. 40.) Tolliver confirmed that Father and Mother each completed a parenting course through Beech Brook. Additionally, Tolliver confirmed that Father completed a mental-health assessment through Signature Health, Inc.

{¶ 17} Despite the parents' efforts, however, the agency continued to have concerns regarding Father and Mother's failure to "understand accountability" or fully acknowledge and address the issues that caused J.T.'s removal from their care. (Tr. 73.) In this regard, Tolliver provided extensive testimony concerning the parents' relationship and interactions with the child.

{¶ 18} Between August 2021 and December 2021, Father and Mother were required to visit the child separately. Tolliver testified that Mother's supervised visits with J.T. were appropriate and that she did appear to have benefitted from the parenting course. Tolliver explained that "[Mother] would do arts and crafts with [J.T.]. They would play games. They would laugh and joke during the visit." (Tr. 42.) Tolliver testified, however, that the visitations frequently shifted focus once Father called Mother and was placed on speaker phone. According to Tolliver:

> When we had the visits and [Father] would be on speaker, the visitation would then change to what the agency was doing wrong, what's going on in [Maternal Grandmother]'s home, and it would change to why [J.T.] is treating the parents the way he is. There was no longer a playing, interacting visit between [Mother] and [J.T.].

(Tr. 43.)

{¶ 19} Tolliver testified that Father's supervised visits with the child were also "primarily focused on what the agency was doing wrong, trying to pinpoint things that was going on in the caregiver's home[.]" (Tr. 45.) Tolliver conceded that there were "moments where [J.T. would] interact with [Father] appropriately." (Tr. 57.) However, she emphasized that there had "never been a visit where [Father's focus] wasn't directed toward the agency or the grandmother." (Tr. 57.) On one

occasion, Father's erratic and disruptive behavior caused the agency to end his visit with J.T. prematurely.

{¶ 20} Father and Mother also had weekly phone conversations with J.T. According to Tolliver, J.T. frequently ended these phone conversations "whenever they begin to yell or [Father] goes on a rant." (Tr. 56.) Tolliver testified that Father's conduct during the phone conversations was similar to his conduct during the supervised visits. Father would bring up the case plan or discuss other agency-related issues that J.T. was not comfortable discussing.

{¶ 21} In December 2021, Father and Mother were granted permission to have joint visits with the child. During these joint visits, Father continued to focus his attention on the agency and his concerns with J.T.'s placement. Ultimately, Father's conduct during a supervised visit caused Tolliver to terminate her involvement in the case based on "safety concerns." (Tr. 50.) Tolliver explained the incident as follows:

> At the visit on February 14th I also had a co-worker Aleesha Anderson sit in with me to supervise the visit. [Father] went on to show her that — he was explaining that he's a prophet, he knows things before they happen, and he knows, you know, what's gonna happen before it does happen.
>
> Then he continued to show her that he made a song prior to me being involved with the family at all, and then he played the song and the song went on to say I'll kill Kenny. And he was like, how would I know I'll kill Kenny if I didn't know you prior when I wrote this song?

(Tr. 50.) Tolliver, whose first name is Kenni, testified that Father's statement caused her to feel unsafe. Accordingly, Tolliver notified her supervisor of Father's conduct and declined to participate in the case moving forward. Thereafter, a police report

was filed against Father after he raised similar threats with Tolliver's colleague during a visit in March 2022.

{¶ 22} As of the date of trial, Father and Mother had yet to engage in family counseling, albeit through no fault of their own. Tolliver testified that a referral for family counseling was made, but that a communication error resulted in unexpected delays. Tolliver conceded that the parents have expressed their intentions to participate in family counseling. Nevertheless, Tolliver testified that the agency is concerned that the parents would not benefit from the counseling at this time. Tolliver explained the agency's position as follows:

> [Mother and Father] want to do family counseling so they can get it over with so that they can move [on.]. They have sent emails stating that [J.T.] is the issue, [J.T.] is the liar, they have not done anything to [J.T.].
>
> So the concern is still even if they go through family counseling, will there be a benefit if they don't believe that there's ever an issue from the beginning?

(Tr. 73.)

{¶ 23} Regarding the child's current placement, Tolliver testified that J.T. was doing well under Maternal Grandmother's care. J.T. made the honor roll in school and is actively participating in occupational therapy through the Cleveland Clinic. Tolliver testified that Maternal Grandmother's home is appropriate and that she shares a strong bond with J.T. She described their relationship as follows:

> [J.T.] confides in [Maternal Grandmother]. [J.T.] does not have any concerns. [Maternal Grandmother] is pretty much his safe haven, his safety net, and pretty much his person. The relationship was appropriate. There's no concern between [J.T.] and [Maternal Grandmother].

(Tr. 61.)  When asked why CCDCFS was seeking legal custody in favor of Maternal

Grandmother, Tolliver stated:

> At this time the agency is asking for legal custody to [Maternal Grandmother] because the parents are not understanding the concerns that's taking place right now between interactions and [J.T.].  The parents have basically said that they have nothing, like no issues.  It's all about [J.T.]. That they're being blackmailed and the concern is [J.T.]'s safety and his overall well-being and mental health as well.

(Tr. 61-62.)

{¶ 24} On cross-examination, Tolliver acknowledged the parents' commit-ment towards visitation, the suitability of their home, and their completion of various components of their respective case plans.  However, Tolliver continued to express concerns with the appropriateness of Father's interactions with the child and the parents' collective failure to acknowledge the role they played in the child's removal from their care.  Tolliver opined that granting legal custody in favor of Mother would not ease the agency's concerns because Mother and Father are still together, and Mother does not intervene when Father's behavior becomes inappropriate.  Tolliver further noted that the parents made no effort to address the case-plan objectives for domestic-violence counseling because they refused to participate in referred programs and denied all allegations of domestic abuse.

{¶ 25} Mendi Carrington ("Carrington"), a trauma counselor employed by FrontLine Service, testified that she provided counseling to J.T. from July 9, 2021, through February 8, 2022.  Carrington explained that J.T. was referred for individual counseling due to his "high levels of anxiety when he would visit his

parents." (Tr. 95.) Carrington testified that she never spoke with Mother or Father, and therefore, had no opinion regarding whether family counseling would be beneficial to J.T. Carrington confirmed, however, that J.T. expressed that he "did not want to live with his parents" because "he did not want to be locked in his room." (Tr. 95-96.)

{¶ 26} Mother testified on behalf of her motion for legal custody. Mother outlined the efforts she had taken to complete the objectives set forth in her case plan and the skills she learned from the parenting program. Mother testified that she never missed a scheduled visit with J.T. and actively participated in phone calls with J.T. during the pendency of this case. Mother further described the appropriateness of the parents' housing and their ability to provide for J.T.'s basic needs. Finally, Mother testified that there were rules J.T. was expected to follow in her home and that he would lose certain privileges if he did not follow directions, respect his parents, or complete his chores and schoolwork. Mother clarified, however, that her rules are not "strict" and that she would never lock J.T. in his room as a form of discipline. (Tr. 111.)

{¶ 27} On cross-examination, Mother reiterated that it is important for J.T. to follow the rules of her home. In particular, Mother testified that she expected J.T., who was nine-years old at the time of trial, to follow directions and "respect [Mother and Father's] space when we're required of it." (Tr. 113.) For instance, Mother explained that it was important that J.T. give Father space when he "wants to be by himself and [does] not want to be bothered with anything that's going on

around the house." (Tr. 113.) Similarly, Mother believed that it was important that J.T. "give her time to recoup from getting off of work" before she "can deal with his concerns and whatever his needs may be at the time." (Tr. 113.)

{¶ 28} At the conclusion of Mother's testimony, the magistrate attempted to clarify several pertinent issues. When questioned why J.T. would report not wanting to live with his parents, Mother stated that she believed J.T. wished to live with Maternal Grandmother because "he gets to play video games all day at his grandmother's house." (Tr. 118.) Mother further expressed her frustration with the agency's failure to "recognize[] the major issue with [J.T.]," which according to Mother is that "[he] has behavioral issues, and nobody has addressed this." (Tr. 120-121.) Finally, Mother denied ever refusing to participate in domestic-violence programing and was under the impression that this component of her case plan was removed by CCDCFS "because there wasn't a concern with domestic violence after they [saw] how we interact with each other." (Tr. 125.)

{¶ 29} At the close trial, the magistrate heard from the child's guardian ad litem, James H. Schulz, Jr., Esq., (the "GAL"). Consistent with his written report, the GAL recommended that legal custody be granted in favor of Maternal Grandmother, stating, in relevant part:

> My concern first of all is the child's fear of the father. I think that's reflected in the counselor's testimony, the social worker's testimony, my own interactions with the child.
>
> * * *
>
> There is no recognition [by Father and Mother] of these issues that the parents have in interacting with the child from my perspective, despite

the fact that they've taken parenting classes, * * * despite all the issues that they've had with him their attitude is you do what we say and that's it.

That's what their attitude is, and they don't take into account his feelings and I've heard the testimony of the social worker, I've heard what the social worker's telling me the issues that have been present with dad, the father and the in-person visits and the telephone visits.

* * * Their attitude is this is all [J.T.'s] fault. It was all his behavior, and if he just (inaudible) everything would be fine. I don't find that to be the case, and my problem is at this point is a year's gone by and nothing has changed. The attitude of the parents has not changed one little bit. That's my problem with the case, and that's why I recommend legal custody now.

* * *

If these parents were gonna get it, they would have got it in the last year. They haven't gotten it. They continue to say it's [J.T.'s] fault. Meanwhile, [J.T.'s] happy with his grandmother. He's doing well in school. He wants to be there obviously. He does not want to go home. I cannot see recommending sending him home, and frankly, I don't think any more time is gonna help the situation.

So it is my recommendation at this time the court grant legal custody to the grandmother.

(Tr. 135-139.)

{¶ 30} Finally, the magistrate addressed Maternal Grandmother on the record and confirmed that she voluntarily signed a Statement of Understanding for legal custody of the child. Maternal Grandmother stated that she wished to be J.T.'s legal custodian and understood that she would be responsible for the care and maintenance of the child until he reaches the age of majority. Maternal Grandmother further confirmed that she understood that Father and Mother would

continue to have certain parental rights with J.T., such as visitation rights and a communication schedule.

{¶ 31} On April 6, 2022, a magistrate issued a decision committing the child to the legal custody of Maternal Grandmother. The magistrate found, in pertinent part:

> There has been progress on the case plan by the mother and by the father, however, progress has not been made in alleviating the cause for the removal of the child from the home.
>
> [CCDCFS] has complied with all of the rules and regulations pertaining to the removal of the child from the home, changes in placement and/or determinations affecting parental visitation rights.
>
> The court finds that the continued residence in or return to the home of [Mother] and [Father] will be contrary to the child's best interest.
>
> The placement of the child is appropriate.
>
> The continued temporary custody of the child is not necessary and not in the child's best interest.
>
> The custody plan for the child is legal custody to [Maternal Grandmother].

{¶ 32} Mother and Father filed joint objections to the magistrate's decision, arguing the juvenile court's findings were against the manifest weight of the evidence adduced at trial.

{¶ 33} In separate judgment entries, dated June 5, 2022, and June 7, 2022, the juvenile court overruled the parents' objections and adopted the magistrate's decision awarding Maternal Grandmother legal custody of J.T. The court further specified that Mother and Father were entitled to visitation "by agreement of the parties."

{¶ 34} Father now appeals from the juvenile court's judgment.

## II. Law and Analysis

{¶ 35} In his sole assignment of error, Father argues the juvenile court's judgment denying his motion for legal custody while simultaneously awarding Maternal Grandmother legal custody of the child is against the manifest weight of the evidence. Father contends "the evidence in the record fails to support the notion that [he] and J.T. could not have been reunified within a reasonable period of time."

{¶ 36} Legal custody is governed by R.C. 2151.353(A)(3). Under the statute, a juvenile court may award legal custody of a child who has been adjudicated abused, neglected, or dependent "to either parent or to any other person who, prior to the dispositional hearing, files a motion requesting legal custody of the child or is identified as a proposed legal custodian in a complaint or motion filed prior to the dispositional hearing by any party to the proceedings." "Legal custody" is

> a legal status that vests in the custodian the right to have physical care and control of the child and to determine where and with whom the child shall live, and the right and duty to protect, train, and discipline the child and to provide the child with food, shelter, education, and medical care, all subject to any residual parental rights, privileges, and responsibilities.

R.C. 2151.011(B)(21). "[L]egal custody is significantly different than the termination of parental rights." *In re So.P.*, 8th Dist. Cuyahoga No. 111468, 2022-Ohio-4015, ¶ 19. Unlike a case in which parental rights are terminated, when a parent loses legal custody of his or her child, the parent "retains residual parental rights, privileges and responsibilities and is not permanently foreclosed from regaining custody." *In*

*re M.S.*, 8th Dist. Cuyahoga No. 108567, 2019-Ohio-5128, ¶ 32, citing *In re T.R.,* 8th Dist. Cuyahoga No. 102071, 2015-Ohio-4177, ¶ 32, *In re G.M.*, 8th Dist. Cuyahoga No. 95410, 2011-Ohio-4090, ¶ 14, and R.C. 2151.353(A)(3)(c).

{¶ 37} When a juvenile court considers an award of legal custody following an adjudication of abuse, neglect, or dependency, "'it does so by examining what would be in the best interest of the child based on a preponderance of the evidence.'" *In re T.R.* at ¶ 44, quoting *In re M.J.M.,* 8th Dist. Cuyahoga No. 94130, 2010-Ohio-1674, ¶ 11, 14. Thus, we apply the "preponderance of the evidence" standard of appellate review to the court's factual findings on a request for legal custody. *In re W.A.J.,* 8th Dist. Cuyahoga No. 99813, 2014-Ohio-604, ¶ 2. A "preponderance of the evidence" means evidence that is "'more probable, more persuasive, or of greater value.'" *In re C.V.M.*, 8th Dist. Cuyahoga No. 98340, 2012-Ohio-5514, ¶ 7, quoting *In re D.P.,* 10th Dist. Franklin No. 05AP-117, 2005-Ohio-5097, ¶ 52.

{¶ 38} However, the decision whether to grant or deny a request for legal custody is within the sound discretion of the juvenile court. When reviewing a juvenile court's "'ultimate decision on whether the facts as determined would make it in the child's best interests to be placed in legal custody,'" we apply an abuse of discretion standard. *In re W.A.J.* at ¶ 2, quoting *In re G.M.* at ¶ 14. An abuse of discretion occurs when a court exercises its judgment in an unwarranted way regarding a matter over which it has discretionary authority. *Johnson v. Abdullah*, 166 Ohio St.3d 427, 2021-Ohio-3304, 187 N.E.3d 463, ¶ 35. Such an abuse ""implies that the court's attitude is unreasonable, arbitrary or unconscionable."" *State v.*

*Montgomery*, Slip Opinion No. 2022-Ohio-2211, ¶ 135, quoting *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983), quoting *State v. Adams*, 62 Ohio St.2d 151, 157, 404 N.E.2d 144 (1980).

{¶ 39} There is no "specific test or set of criteria" that must be applied or considered when determining what is in a child's best interest on a motion for legal custody. *In re T.R.*, 2015-Ohio-4177, at ¶ 48. Unlike permanent custody cases in which the juvenile court must consider the factors outlined in R.C. 2151.414(D), R.C. 2151.353(A)(3) does not independently specify the factors to be considered in determining what is in a child's best interest on a request for legal custody. *In re G.M.*, 2011-Ohio-4090, at ¶ 15. Nevertheless, this court has held that the R.C. 2151.414(D) best interest factors may be "instructive" in making that determination. *See, e.g., In re V.P.,* 8th Dist. Cuyahoga No. 109649, 2020-Ohio-5626, ¶ 32; *In re D.T.*, 8th Dist. Cuyahoga Nos. 100970 and 100971, 2014-Ohio-4818, ¶ 20, citing *In re E.A.*, 8th Dist. Cuyahoga No. 99065, 2013-Ohio-1193, ¶ 13. Those factors include: (1) the interaction of the child with the child's parents, relatives, caregivers and any other person who may significantly affect the child; (2) the wishes of the child, as expressed directly by the child or through the child's guardian ad litem; (3) the custodial history of the child and (4) the child's need for a legally secure permanent placement. R.C. 2151.414(D).

{¶ 40} Courts have also looked to the best interest factors set forth in R.C. 3109.04(F) as a potential guide in determining what is in a child's best interest for purpose of a motion for legal custody. *See, e.g., In re J.O.*, 8th Dist. Cuyahoga No.

87626, 2007-Ohio-407, ¶ 11; *In re K.S.*, 12th Dist. Warren Nos. CA2019-01-009 and CA2019-02-015, 2019-Ohio-2384, ¶ 37 ("As the paramount concern is the best interest of the child, the court 'should consider the totality of the circumstances affecting the best interest of the child.'" * * * A court may therefore consider the relevant best interest factors set forth in either R.C. 3109.04(F) or R.C. 2151.414(D) in determining the best interest of the child."), quoting *In re S.L.*, 12th Dist. Butler Nos. CA2012-07-137 through CA2012-07-142 and CA2012-07-147 through CA2012-07-149, 2013-Ohio-781, ¶ 54. Such factors include, but are not limited to (1) the wishes of the child's parents regarding the child's care; (2) the child's interaction and interrelationships with the child's parents, siblings and any other person who may significantly affect the child's best interest; (3) the child's adjustment to home, school and community; (4) the mental and physical health of all persons involved in the situation; and (5) the extent to which court-approved visitation and companionship rights are likely to be honored and facilitated. R.C. 3109.04(F).

{¶ 41} In this case, the juvenile court found the child's best interests would be served by placing him in the legal custody of Maternal Grandmother. In support of its best interest's determination, the juvenile court found (1) Mother and Father failed to alleviate the causes for the child's removal from their home, (2) it would be contrary to the child's best interests to return him to the parents' home, and (3) placement with Maternal Grandmother was appropriate. The court further explained its judgment as follows:

[CCDCFS] has made reasonable efforts to finalize the permanency plan for the child. These efforts are parenting education classes, mental health services, psychological evaluation, and family counseling. The Father was prescribed medication, however, the Father discontinued due to side effects. The Mother and the Father had been having supervised visitations. The Father exhibited erratic and angry outbursts during two of the visits resulting in him being asked to leave. Additionally, the Father has made veiled threats against the social worker through a song. The parents continue to blame the child for the issues that gave rise to the complaint and the issues that still exist today. The Agency does not believe that the parents have benefitted from services. The Mother feels that the child has behavior issues and that he gets his way at the Maternal Grandmother's home. The child does not wish to return to the parent's home as he is afraid of being locked in his room for discipline purposes.

{¶ 42} On appeal, Father argues the evidence adduced at trial failed to establish that the legal custody in favor of Maternal Grandmother was in the child's best interests. He contends that the agency was unable to substantiate a number of allegations supporting the removal of J.T. from the parents' care, including prior reports of domestic violence, sexual abuse, and malnutrition. According to Father,

Of all CCDCFS's allegations against Father, only two apparently survived investigation: (1) his irrational, and as they perceived it, threatening comments, which gave rise to concerns about his mental health, and (2) that he may have locked J.T. in his room for an unspecified period of time on an unspecified number of occasions.

{¶ 43} After careful consideration, we find the record supports the juvenile court's findings by a preponderance of the evidence. The record shows that at the time of trial, Maternal Grandmother had provided J.T. a safe and stable home environment for approximately 14 months. Tolliver testified that J.T. has adjusted well to Maternal Grandmother's home and is having his needs fully met. Maternal Grandmother shares a strong and loving bond with J.T., and J.T. has articulated that

he feels safe with her. In addition, Tolliver explained that J.T. has not displayed any significant behavioral issues, has excelled at school, and is actively participating in occupational therapy under Maternal Grandmother's supervision and care.

{¶ 44} With respect to Mother and Father, there is no dispute that the parents love J.T. and wish to have him returned to their home. At trial, Tolliver conceded that Mother and Father completed various portions of their respective case plans, were consistent in their visitation, and often interacted with J.T. appropriately. Nevertheless, Tolliver testified that the parents failed to alleviate the agency's concerns for the child due to their tendency to deflect blame and their reluctance to acknowledge the issues that caused the child to be removed from their care. As noted by Tolliver and the GAL, the parents refuse to accept responsibility for their conduct and continue to believe their involvement with the agency is the product of J.T.'s "behavioral issues." (Tr. 61-62, 73, 87, 120-121, 138.) The GAL and Tolliver similarly expressed that Father continues to display erratic and delusional behaviors in the child's presence. For instance, Tolliver explained that Father consistently failed to focus his attention on J.T. during supervised visitation and routinely used the visits as an opportunity to disparage the agency and the child's caregiver. Such behavior included angry and erratic outbursts that caused a visitation to be prematurely ended and a veiled threat against Tolliver that caused her to terminate her role in the case out of fear for her personal safety. Father was prescribed medication to address these behavior concerns following a mental-health consultation, but voluntarily decided to stop taking the medication due to the

medications' alleged side effects. Under these circumstances, the GAL expressed ongoing concerns with Father's mental health, stating:

> And I have reviewed the entire [mental-health] evaluation from Signature Health, not just the first six pages, the last ten, okay, which apparently there was no testimony about. But I reviewed that, and father's recommendation to get a full psychiatric evaluation. That hasn't happened.
>
> The report says even more things that don't make sense on their face[.] * * * [Signature Health] could not come up with a concrete diagnosis because, as [McLaughlin] testified to, she couldn't verify whether the facts are true or not.
>
> But to say there's not an issue with dad's mental health is ignoring the facts from my perspective.

(Tr. 137-138.)

{¶ 45} Finally, the record reflects that J.T. has consistently expressed a desire to remain in the custody and care of Maternal Grandmother. Here, Tolliver testified that J.T. has continuously stated "that he would rather stay where he is." (Tr. 86.) Similarly, the GAL whose sole responsibility is to advocate for the child's best interests, testified that J.T. genuinely fears his father and does not wish to return to the parents' home.

{¶ 46} Collectively, we find the foregoing evidence demonstrates that J.T. needed a legally secure placement that could not be achieved by an extension of temporary custody or an award of legal custody in favor of Mother or Father. While the record establishes that J.T. is currently placed in a situation that fosters growth, stability, and security, both Mother and Father have failed to acknowledge the agency's concerns or take the necessary steps to substantially remedy the issues that

cause J.T. to be removed from their care. Under these circumstances, we cannot say, based on the record before us, that the juvenile court abused its discretion in finding that an award of legal custody of J.T. to Maternal Grandmother was in the child's best interests. The juvenile court's decision was well reasoned, was not arbitrary or unconscionable, and the court's findings are supported by ample, competent, and credible evidence in the record.

{¶ 47} Father's sole assignment of error is overruled.

{¶ 48} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN T. GALLAGHER, JUDGE

SEAN C. GALLAGHER, A.J., and
MARY EILEEN KILBANE, J., CONCUR