[Cite as *In re S.S.*, 2025-Ohio-842.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

IN RE S.S., ET AL.                             :

                                               :          No. 114445

[Appeal by Y.M., Mother]                       :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** March 13, 2025

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case Nos. AD22902694 and AD22902695

---

***Appearances:***

Scott J. Friedman, *for appellant.*

Michael C. O'Malley, Cuyahoga County Prosecuting
Attorney, Joseph C. Young, Assistant Prosecuting
Attorney, *for appellee.*

MARY J. BOYLE, J.:

{¶ 1} This appeal involves a child-protection matter involving two minor children before the Cuyahoga County Juvenile Court in Case Nos. AD22902694 and AD22902695.[1] Y.M., ("Mother"), appeals the decisions of the trial court granting

---

[1] Because the filings in both cases are nearly identical, citations to the record will be to Case No. AD22902694, unless a more specific citation is warranted.

legal custody of S.D.M. to Father[2] and permanent custody of S.S. to plaintiff-appellee, Cuyahoga County Division of Children and Family Services ("the Agency"). After careful review of the record, we affirm.

## I. Facts and Procedural History

{¶ 2} On March 15, 2022, Mother's two children, S.S. (nine-years-old) and S.D.M. (one-year-old) were removed from Mother's care after law enforcement responded to Mother's home and found the children alone. S.S. had been in the legal custody of a relative since her removal in 2018 and was visiting Mother that day.[3]

{¶ 3} On March 16, 2022, the Agency filed a complaint for neglect, abuse (S.S.), dependency (S.D.M.) and temporary custody, as well as a motion for pre-dispositional temporary custody. That same day emergency custody was granted to the Agency for both children. A case plan was developed and implemented in an attempt to reunify the children with Mother. S.D.M.'s Father participated at the trial-court level, while S.S.'s father did not.

{¶ 4} In August 2022, S.S. was adjudicated abused and neglected, whereas S.D.M. was adjudicated neglected and dependent. Both were committed to the temporary custody of the Agency, where they remained until trial.

{¶ 5} In September 2024, trial commenced upon the Agency's motion requesting that the court grant permanent custody of S.S. to the Agency, and legal

---

[2] Father of S.D.M. was a party to the case below, but did not participate in this appeal.

[3] S.S. was removed in 2018, when she was left unsupervised, and Mother "failed to complete her case plan to effectuate reunification." (Agency brief, p. 3.)

custody for S.D.M. to Father.  The following is a summary of the evidence that was presented at trial.

### The Agency's Case

**{¶ 6}** The Agency established, by way of stipulated exhibits, that S.S. was adjudicated dependent in 2018 and placed in the legal custody of a relative.  In addition, four certified copies of Mother's recent convictions were entered into evidence, as well as several police reports.  In 2023, Mother was convicted of petty theft and resisting arrest.  In 2024, Mother was convicted in three separate cases including:  (1) disorderly conduct; (2) theft; and (3) driving under suspension and child restraint.

**{¶ 7}** Agency worker April Palidar ("April"), from Cuyahoga County Children and Family Services, testified that she was assigned the children's case in September 2022 and that, as of the date of trial, the children had remained in the uninterrupted custody of the Agency since March 2022.  She testified that the permanency plan was for reunification and that Mother was initially referred to Safe Babies Team, which helps promote speedy reunification.  The case plan required that Mother complete parenting classes, a substance-abuse assessment, and a mental-health assessment.

**{¶ 8}** According to April, Mother was referred to parenting classes because she has a history of leaving S.S. unsupervised.  She testified that Mother was referred to but failed to complete several different parenting programs, until September 2023, when she finally completed a parenting program at Ohio

Guidestone. At the same time, Mother completed Parent/Child Psychotherapy. Although Mother finished these programs, April still had concerns about Mother's failure to work with a mental health provider on a consistent basis, as well as her "emotional outbursts" that caused her "legal issues" and troubles in her personal life. (Tr. 21.)

{¶ 9} April explained that Mother was referred for a substance-abuse assessment because she used marijuana on a daily basis. April testified that Mother had "a medical marijuana card" to help her with anxiety; however, her urine screens indicated extremely high levels of THC, which suggests that Mother is abusing marijuana. (Tr. 22.) Nevertheless, Mother completed the assessment and no treatment was recommended.

{¶ 10} According to April, Mother was referred for a mental-health assessment because she has "an extensive history of mental health issues, and the repeated emotional outbursts and the lack of emotional control." (Tr. 23.) April testified that over the years Mother has spent time in several different residential treatment facilities for her mental-health issues and has been diagnosed with post-traumatic stress disorder ("PTSD") and anxiety. She explained that as Mother's anxiety increases, April has witnessed Mother become uncooperative, aggressive, and threatening.

{¶ 11} April confirmed that for over a year Mother participated in regular counseling through Ohio Guidestone. According to April, Mother's counselor felt Mother was doing well and the counselor had no concerns. Nevertheless, in

December 2023, Mother stopped counseling, alleging that the provider was unavailable, and Mother was no longer benefiting from the services. Because of Mother's poor decision-making skills, April believed that Mother still needed mental-health counseling. As an example of her poor decision making, April testified that in November 2023, while Mother had S.D.M. for an overnight visit, Mother left the child with her grandfather, while Mother went shopping with a friend. During that outing, Mother was arrested for shoplifting children's clothing and resisting arrest.[4]

{¶ 12} Thereafter, Mother was referred to four more mental health providers; however, Mother claimed that she was unable to schedule an appointment with three of the four providers. Finally, in May 2024, Mother was referred to People, Places & Dreams. This organization was able to provide case-management services, peer support, drug-and-alcohol assessment, and a mental-health provider. Nevertheless, Mother failed to attend her mental health appointments, and her case was closed with the mental health provider.

{¶ 13} Mother was then sent to Signature Health who diagnosed her with bipolar disorder, depression, anxiety, and PTSD. Mother started counseling and medication through Signature Health in July 2024; however, April's concerns remained because Mother continued to demonstrate the same uncooperative and unreasonable behavior as she did in the past.

---

[4] In the midst of April's testimony, the trial court instructed Mother to not use her phone during trial. In addition, Mother left the courtroom numerous times throughout the trial.

{¶ 14} According to April, when the case started, Mother had weekly two-hour supervised visits with the children at a county building because Mother had been shot in the foot while attempting to stop an argument between her sister and some individuals. The visitations were eventually moved to a library near Mother's home. April testified that she had no concerns regarding Mother's visits at that time. By March 2023, weekly unsupervised visits began. Again, April had no concerns.

{¶ 15} Overnight visits with the children started in June 2023 at Mother's apartment. According to April, however, Mother did not renew her lease in August 2023 but did not secure new housing. So from August 2023 until November 2023, Mother lived in three different places, her aunt's, a friend's, and then her father's girlfriend's house. Overnight visitations continued through the moves until the end of November 2023 when April learned that the police had been called on Mother for allegedly stealing from her father and hitting her ten-year-old brother in the head. It does not appear that charges were filed; however, this is also when April learned about Mother's latest shoplifting arrest. Due to Mother's actions, visitations were changed to supervised.

{¶ 16} According to April, Mother is consistent with the weekly two-hour visits and interacts well with the children. Mother provides food, crafts, toys, and new clothes, with the tags still on, for the children. April testified that Mother is not working.

{¶ 17} April explained that the visitations remained supervised because of Mother's behavior towards April and others. During one visitation, Mother became

upset with April because Mother learned that the Agency still planned to move forward with permanent custody of the children. April testified that Mother started "yelling that she was uncomfortable with [April] being there and that she didn't want [April] there anymore." (Tr. 50.) Mother carried on in front of her children for approximately 90 minutes before allowing April to leave with the girls. Additionally, April testified that Mother was arrested on three separate occasions in June 2024. She was arrested for domestic violence against her boyfriend; she was arrested for theft; and she was arrested for menacing her elderly neighbor. April concluded that although Mother had completed the case plan, she did not benefit from the services "[b]ecause [Mother] continues to have these emotional outbursts. [Mother]'s been able to show small periods of stability and understanding, but it doesn't seem to ever last very long, so there's still concerns[.]" (Tr. 52.)

{¶ 18} April testified that originally both girls were in foster care together. S.S., however, was removed and placed with a relative due to aggressive behavior towards the younger child. At the time of trial, S.S., who was 11 years old, was in counseling and on medication for ADHD. According to April, S.S. expressed her desire to live with her younger sister, S.D.M., but is inconsistent regarding her which adult she would prefer to live with. April indicated that she did not think Mother could consistently meet S.S.'s needs because Mother cannot meet her own. During the pendency of this case, S.S.'s father has not visited, established paternity, or provided support; his whereabouts are unknown. April concluded that due to

Mother's inability to control her behavior, it was in the best interest of S.S. to be placed in the permanent custody of the Agency.

{¶ 19} Regarding S.D.M., April testified that she is a typical three-year-old who has been in foster care during the pendency of this case. Father has completed the case plan, established paternity, developed a relationship with S.D.M., and obtained stable housing. April confirmed that Father and his fiancée are willing and able to provide a stable home for S.D.M., where she will live with their two minor children ages seven and one. April concluded that it was in the best interest of S.D.M. for Father to be awarded legal custody, as opposed to Mother who is unable to control her behavior.

{¶ 20} On cross-examination, April acknowledged that Mother had completed her case plan, had appropriate housing, that the children were always happy to see Mother, and that the children were well-bonded with Mother. Nevertheless, April recommended that S.S. be placed in the permanent custody of the Agency and S.D.M. be placed in the legal custody of Father.

{¶ 21} The Agency called Patrolman Jamie Lee of the Garfield Heights Police Department ("Officer Lee") to testify regarding his three encounters with Mother. Officer Lee described Mother's demeanor and actions when he arrived for a domestic-violence call in June 2024. He indicated that Mother was hostile and uncooperative and had assaulted her boyfriend in front of officers. The second incident also happened in June 2024 and involved a neighbor dispute. When Officer Lee arrived, Mother was "yelling, screaming, cussing down at her [elderly]

neighbor." (Tr. 245.)  Mother refused to cooperate with police and "continued to talk down to [Officer Lee], belittle [Officer Lee], just showed disorderly behavior towards [Officer Lee]." (Tr. 246.)  Officer Lee recommended to the prosecutor that Mother be charged with menacing.  The most recent encounter occurred mid-trial.  Officer Lee responded to Mother's house for a disturbance call.  When he arrived, Officer Lee observed Mother's hand bleeding.  He learned that Mother had lost her key and cut her hand pounding on the neighbor's window, breaking it.  Officer Lee testified that Mother was hostile towards him and the neighbor calling them both names.

**Mother's Witnesses**

{¶ 22} Mother presented testimony from Danielle Mandato ("Mandato"), a counselor from Signature Health, whom she started treatment with in July 2024.  Mandato testified that Mother has met with her four times virtually and that they are still in the rapport-building stage.  On cross-examination, Mandato confirmed that Mother was at least ten minutes late to two appointments that are only 30 minutes in duration and that she did not attend one appointment.  Mandato also confirmed that Mother was 20 minutes late to her assessment and during the assessment, Mother was in and out of a hair salon, walking down the sidewalk, and in an Uber making it difficult to complete the assessment.  She also testified that it was out of her scope of practice to opine as to whether Mother was mentally stable enough to parent children.

{¶ 23} Mother's sister gave a statement to the court indicating that she was ready and willing to take custody of both girls and adopt them.

{¶ 24} Tiffany Triplett ("Triplett"), a case manager at People, Places & Dreams, testified on Mother's behalf. She indicated that she started working with Mother in April 2024 and helped Mother complete her case plan. According to Triplett, she speaks with Mother on a daily basis, helping her process her emotions. Triplett testified that Mother has made progress and is calmer since starting her bipolar medications. On cross-examination, she admitted that she was unaware of the charges Mother accumulated in June 2024.

{¶ 25} Daneen Harrell ("Harrell"), a peer support specialist and parent coordinator at People, Places & Dreams, testified on Mother's behalf. Harrell testified that she has worked with Mother for three months and speaks with Mother on a daily basis, encouraging her, and teaching her a better way of life. Harrell has witnessed approximately four visitations between Mother and the children. She testified that Mother and the children love each other and she is a great mother. According to Harrell, she has had a positive impact on Mother.

{¶ 26} D.L., the mother of Father's middle child, testified on behalf of Mother. She indicated that she has known Mother since 2019 and that she has seen a positive change in Mother's behavior over the last 18 months. She testified that Mother loves her children. D.L. indicated that she would help Mother with anything she needed if Mother is reunited with her children. D.L. testified the Father has not seen their daughter in two years, because D.L. does not feel comfortable around

Father, asserting that Father is abusive to D.L. She does not, however, think Father would hurt their daughter, nor did she press charges on Father for any alleged incidents.

{¶ 27} Christina Joliat ("Joliat"), the children's guardian ad litem ("GAL"), testified on Mother's behalf. Although Joliat recommended S.S. be placed in the permanent custody of the Agency, and S.D.M. be placed in Father's custody, she testified that Mother has made significant changes to her behavior over the course of this case. She stated that at the beginning of the case, it was difficult to have a five-minute conversation with Mother, but that has changed. According to Joliat, Mother has a very strong bond with the children and Joliat was hoping to reunify, but they were "out of time." (Tr. 257.) She stated that Mother has appropriate housing and is compliant with her medications. Joliat testified that Mother did not create the issues with the providers, but rather there were issues with the providers communicating with the Agency. Joliat's main concern was that S.S. is a difficult child with mental-health issues, and Joliat is uncertain how Mother would handle her because Mother has not had extended visits since November 2023. On cross-examination, Joliat admitted that Mother has not had overnight visits with either child due to Mother's poor choices and problematic behavior.

{¶ 28} Mother testified on her own behalf. Mother stated that she was between jobs but had support through "programming," so she was only responsible to pay for her phone bill and internet. (Tr. 156.) She said she was on probation for disorderly conduct and theft. Mother testified that she completed parenting classes

through Ohio Guidestone and learned how to communicate better with her children, and "helping me to observe like my feelings." (Tr. 161.) Mother stated that she did not have difficulties parenting her children. She had a medical marijuana card to calm her nerves. Mother testified that she was satisfied with Ohio Guidestone's services; however, her provider's caseload increased, and the provider stopped showing up to Mother's appointments, so Mother stopped services.

{¶ 29} Mother stated that in July 2024 she started with Signature Health for her mental-health issues, and was prescribed two medications that she testified "makes me less hotheaded." (Tr. 176.) Mother explained the incident with April, stating that she was upset with the Agency's decision to move forward with their motion for permanent custody. She said she thought she handled it well, because she did not throw anything, or make the children upset. Mother, however, testified that the children were upset.

{¶ 30} Mother then testified that she cleared 10-12 warrants during the pendency of this case in order to get her children back. She explained that she missed one of her therapy appointments because she dropped her phone in a bucket of dishwater and did not know for five hours, and she was late to another appointment because she was in court. Mother relented that she knows people who use drugs and have custody of their children. She asked the court for joint custody, stating, "Like I'm not beating my kids. I don't not provide for them. Like I don't understand. Like I've done what was asked of me. . . . Granted, I was not supposed

to do that extra stuff that I did catch those cases, be with somebody that wasn't no good[.]" (Tr. 180.)

{¶ 31} On cross-examination, Mother was argumentative about every topic discussed. Mother argued about the dates and locations of each of her numerous arrests and convictions that she has had dating back to 2015. She continuously denied responsibility for her various crimes, sometimes blaming the victims and her friends, and other times arguing that it was in the past and was not indicative of her parenting skills. Regarding Mother's child-endangering conviction from 2015, Mother stated that she went upstairs to change clothes and S.S. went outside to play in the front yard. She said she was charged because she would not talk to police, not because her child was in a "predicament." (Tr. 196.) According to S.S.'s date of birth, she was approximately two years old at the time of the incident.[5]

### Father's Witness

{¶ 32} Jaleesa Singleton ("Singleton") testified on Father's behalf. Singleton indicated that she fostered S.D.M. for the first six months, when Father was first getting to know his daughter. Singleton testified that Father was "very invested" and "trying to do things the right way." (Tr. 232.) Father checked in on S.D.M. nearly every day, and S.D.M. was happy when she was around Father. Singleton had no reservations with the court granting legal custody to Father.

---

[5] A certified copy of Mother's conviction for child endangering in 2015 is part of the record, but unclear if it was an exhibit at trial.

{¶ 33} On September 16, 2024, the trial court issued decisions finding that it was in the best interest of the children to grant permanent custody of S.S. to the Agency and legal custody of S.D.M. to Father. Mother timely appeals, and raises two assignments of error for our review:

> **Assignment of Error I:** The juvenile court abused its discretion when it awarded legal custody of S.D.M. to Father, in violation of Mother's rights under the Fourteenth Amendment to the United States Constitution and Article I, Section 16 of the Ohio Constitution.
>
> **Assignment of Error II:** The juvenile court erred in terminating Mother's parental rights of S.S., in violation of her rights under the Fourteenth Amendment to the United States Constitution and Article I, Section 16 of the Ohio Constitution.

## II. Law and Analysis

### Legal Custody to Father was Not an Abuse of Discretion

{¶ 34} In Mother's first assignment of error, she contends that there was little evidence in the record to establish that it was in S.D.M's best interest to award legal custody to Father instead of Mother. We disagree.

{¶ 35} In August 2024, the Agency filed a "motion to amend dispositional prayer from 'permanent custody' to 'legal custody to [Father].'"[6] Legal custody is governed by R.C. 2151.353(A)(3), which provides that a juvenile court may award legal custody of a child who has been adjudicated abused, neglected, or dependent to a parent, who, prior to the dispositional hearing, files a motion requesting legal

---

[6] Prior to temporary custody being granted, Father had filed a motion for legal custody of the child.

custody or is identified by a party, like the Agency, as a proposed legal custodian.

"Legal custody" is

> a legal status that vests in the custodian the right to have physical care and control of the child and to determine where and with whom the child shall live, and the right and duty to protect, train, and discipline the child and to provide the child with food, shelter, education, and medical care, all subject to any residual parental rights, privileges, and responsibilities.

R.C. 2151.011(B)(21).

{¶ 36} When a juvenile court considers an award of legal custody following an adjudication of abuse, neglect, or dependency, "'it does so by examining what would be in the best interest of the child based on a preponderance of the evidence.'" *In re T.R.,* 2015-Ohio-4177, ¶ 44 (8th Dist.), quoting *In re M.J.M.*, 2010-Ohio-1674, ¶ 11, 14 (8th Dist.).  A "preponderance of the evidence" means evidence that is "'more probable, more persuasive, or of greater value.'"  *In re C.V.M.,* 2012-Ohio-5514, ¶ 7 (8th Dist.), quoting *In re D.P.*, 2005-Ohio-5097, ¶ 52 (10th Dist.)

{¶ 37} The decision whether to grant or deny a request for legal custody is within the sound discretion of the juvenile court.  When reviewing a juvenile court's decision regarding legal custody, we apply an abuse of discretion standard.  *In re J.T.*, 2022-Ohio-4747, ¶ 38 (8th Dist.), citing *In re W.A.J.,* 2014-Ohio-604, ¶ 2 (8th Dist.).  An abuse of discretion occurs when a court exercises its judgment in an unwarranted way regarding a matter over which it has discretionary authority. *Johnson v. Abdullah*, 2021-Ohio-3304, ¶ 35.

{¶ 38} "There is no 'specific test or set of criteria' that must be applied or considered when determining what is in a child's best interest on a motion for legal custody." *In re J.T.* at ¶ 39, quoting *In re T.R.*, 2015-Ohio-4177, ¶ 48 (8th Dist.) Nevertheless, this court has held that the R.C. 2151.414(D) best-interest factors may be "instructive" in making that determination. *In re V.P.*, 2020-Ohio-5626, ¶ 32 (8th Dist.); *In re D.T.*, 2014-Ohio-4818, ¶ 20 (8th Dist.), citing *In re E.A.*, 2013-Ohio-1193, ¶ 13 (8th Dist.). Those factors include: (1) the interaction of the child with the child's parents, relatives, caregivers and any other person who may significantly affect the child; (2) the wishes of the child, as expressed directly by the child or through the child's guardian ad litem; (3) the custodial history of the child; and (4) the child's need for a legally secure permanent placement. R.C. 2151.414(D).

{¶ 39} Courts have also looked at the best-interest factors set forth in R.C. 3109.04(F) as a potential guide in determining what is in a child's best interest for the purpose of a motion for legal custody. *In re J.T.* at ¶ 40. Such factors include, but are not limited to, (1) the wishes of the child's parents regarding the child's care; (2) the child's interaction and interrelationships with the child's parents, siblings, and any other person who may significantly affect the child's best interest; (3) the child's adjustment to home, school, and community; (4) the mental and physical health of all persons involved in the situation; and (5) the extent to which court-approved visitation and companionship rights are likely to be honored and facilitated. R.C. 3109.04(F).

**{¶ 40}** Here, the evidence in the record establishes that Father complied with the case plan, established paternity, developed a relationship with S.D.M., and had stable housing for the child. In addition, the evidence showed that the child bonded with Father, his fiancée, and their children. Further, the GAL recommended that it was in the best interest of S.D.M. to be placed in the legal custody of Father. The evidence also established that it is not in the child's best interest to award legal custody to Mother because she had not sufficiently addressed her mental-health issues that have led to multiple arrests, including domestic violence, menacing, and theft.

**{¶ 41}** After reviewing the entire record, we cannot say that the trial court abused its discretion when it awarded Father legal custody of S.D.M. Accordingly, Mother's first assignment of error is overruled.

### Permanent Custody

**{¶ 42}** In Mother's second assignment of error, she argues that the trial court's decision to terminate Mother's parental rights and award permanent custody to the Agency for S.S. was against the manifest weight of the evidence because the evidence established that Mother remedied the concerns that led to the child's removal, Mother has a strong bond with S.S., and she has appropriate housing. The Agency argues that the trial court properly awarded permanent custody to the Agency under both R.C. 2151.414(B)(1) and (D)(2).

**{¶ 43}** Recently, the Ohio Supreme Court reexplained the manifest-weight-of-the-evidence standard in a parental rights case as follows:

"When reviewing for manifest weight, the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered." [*Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 20.] "In weighing the evidence, the court of appeals must always be mindful of the presumption in favor of the finder of fact." *Id.* at ¶ 21. "The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 10 Ohio B. 408, 461 N.E.2d 1273 (1984). "'If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment.'" *Id.* at fn. 3, quoting 5 Ohio Jurisprudence 3d, Appellate Review, Section 603, at 191-192 (1978).

*In re Z.C.*, 2023-Ohio-4703, ¶ 14.

{¶ 44} Initially, we recognize that the right to raise one's own child is "an 'essential' and 'basic civil right.'" *In re Murray*, 52 Ohio St.3d 155, 156 (1990), quoting *Stanley v. Illinois*, 405 U.S. 645 (1972); *In re B.B.C.*, 2024-Ohio-588, ¶ 14, (8th Dist.). "Parents have a 'fundamental liberty interest' in the care, custody, and management of the child." *Id.,* quoting *Santosky v. Kramer*, 455 U.S. 745, 753 (1982). This right, however, is not absolute. "The natural rights of a parent are always subject to the ultimate welfare of the child, which is the polestar or controlling principle to be observed." *In re Cunningham*, 59 Ohio St.2d 100, 106 (1979), quoting *In re R.J.C.*, 300 So.2d 54, 58 (Fla. App. 1974).

{¶ 45} Accordingly, R.C. 2151.414(B)(1) establishes a two-part test for courts to apply when determining whether to grant a motion for permanent custody. A

juvenile court may grant a public child services agency's motion for permanent custody if it determines, by clear and convincing evidence, that (1) any one of the five factors set forth in R.C. 2151.414(B)(1)(a)-(e) exists, and (2) permanent custody is in the best interest of the children — taking into consideration the factors set forth in R.C. 2151.414(D)(1). We note that because the findings under R.C. 2151.414(B)(1)(a)-(d) are alternative findings, each is independently sufficient to establish one prong of the two-part test to grant a motion for permanent custody. *In re Dalton*, 2007-Ohio-5805 (5th Dist.); *In re K.C.*, 2024-Ohio-2081, ¶ 45 (10th Dist.); *In re A.J.*, 2024-Ohio-3291, ¶ 42 (5th Dist.).

{¶ 46} "'Clear and convincing evidence is that measure or degree of proof which is more than a mere "preponderance of the evidence," but not to the extent of such certainty as is required "beyond a reasonable doubt" in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.'" *In re Z.C.* at ¶ 7, quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶ 47} Applicable to the case at hand is the factor set forth in R.C. 2151.414(B)(1)(d), which states that the child has been in the temporary custody of one or more public children services agencies for 12 or more months of a consecutive 22-month period. The record in this case reflects that S.S. was placed in emergency custody of the Agency on March 16, 2022; thereafter S.S. was adjudicated abused and neglected and placed in the temporary custody of the Agency. At the time the motion for permanent custody was filed, January 26, 2024,

the child had been in Agency custody for 12 or more months of a consecutive 22-month period satisfying R.C. 2151.414(B)(1)(d).

{¶ 48} Having determined that the Agency established that S.S. has been in the custody of the Agency for 12 or more months of a consecutive 22-month period, we turn to Mother's argument that she has remedied the concern's that led to S.S.'s removal and that it was not in the child's best interest to award permanent custody to the Agency.

{¶ 49} R.C. 2151.414(D)(1) requires that the juvenile court consider all relevant factors in determining whether the children's best interests would be served by granting the permanent-custody motion. These factors include (a) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers, and out-of-home providers; (b) the child's wishes, as expressed directly by the child or through the child's guardian ad litem; (c) the child's custodial history; (d) the child's need for a legally secured permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (e) whether any of the factors set forth in R.C. 2151.414(E)(7)-(11) apply. R.C. 2151.414(D)(1). A juvenile court must consider each of the R.C. 2151.414(D)(1) factors when making a permanent custody determination, but no one factor is given greater weight than the others. *In re Schaefer*, 2006-Ohio-5513, ¶ 56. Only one of the factors set forth in R.C. 2151.414(D)(1) needs to be resolved in favor of permanent custody. *In re D.H.*,

2022-Ohio-2780, ¶ 46 (8th Dist.), citing *In re G.W.*, 2019-Ohio-1533, ¶ 72 (8th Dist.).

{¶ 50} In the instant case, the record reflects that the juvenile court considered all of the evidence and arguments of counsel and determined that the Agency proved by clear and convincing evidence that permanent custody was in the best interest of S.S. The court reasoned that S.S. had not been in Mother's custody since 2018, and S.S. has resided with her maternal aunt since 2022, who has expressed interest in adopting S.S. The trial court noted that the GAL recommended permanent custody to the Agency, and that the father had abandoned the child. Further, the trial court conducted an in camera interview with S.S. and considered her wishes, when finding that reunification was not in the best interest of the child. After reviewing the entire record, we cannot say the juvenile court lost its way when it granted the Agency's motion for permanent custody under R.C. 2151.414(D)(1).

{¶ 51} Even though it was not required in this case, the trial court set forth "an additional basis for granting permanent custody" under R.C. 2151.414(D)(2). (J.E., Sept. 16, 2024, R. 377.) R.C. 2151.414(D)(2) dictates that permanent custody is in the best interest of the child and the court is required to commit the child to the permanent custody of a public children services agency when all of the following apply:

> (a) The court determines by clear and convincing evidence that one or more of the factors in division (E) of this section exist and the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent.

(b) The child has been in an agency's custody for two years or longer and no longer qualifies for temporary custody pursuant to division (D) of section 2151.415 of the Revised Code.

(c) The child does not meet the requirements for a planned permanent living arrangement pursuant to division (A)(5) of section 2151.353 of the Revised Code.

(d) Prior to the dispositional hearing, no relative or other interested person has filed, or has been identified in, a motion for legal custody of the child.

{¶ 52} Here, the trial court made the findings under (a)-(d) of R.C. 2151.414(D)(2). The court determined that S.S. was in the Agency's custody for more than two years and no longer qualified for temporary custody. In addition, S.S. did not meet the requirements for a planned permanent living arrangement, and no relative or other interested person had filed a motion for legal custody prior to trial. Finally, the trial court found, by clear and convincing evidence, that five of the factors set forth in R.C. 2151.414(E) applied in this case, including:

(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

(2) Chronic mental illness, chronic emotional illness, intellectual disability, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing pursuant to division

(A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code;

. . .

(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child[.]

. . .

(10) The parent [father] has abandoned the child.

. . .

(16) Any other factor the court considers relevant.

{¶ 53} The trial court reasoned that

[Mother] has not benefitted from [the case plan] services sufficiently to be reunified with the child. This was shown by a lack of consistency with providers, [Mother]'s emotional outbursts, and repeated arrests and police involvement including three days ago after the first full day of trial.

[Mother] has an extensive history of mental health issues that interfere with her daily life. [Mother] lost unsupervised visits in November of 2023, and stopped working with Ohio Guidestone in December of 2023. No mental health services were started again until July of 2024 despite several referrals which includes Caritas, Care Alliance, Murtis Taylor and The Centers. In July of 2024, [Mother] started services with Signature Health. Her counselor, who testified as a witness called by [Mother] stated that they were just in the process of setting treatment goals, that [Mother] had attended four of the five on-line thirty-minute sessions and had been at least ten minutes late to two of them.

The Mother's behavior was described [by] both witnesses for the agency and the GAL as aggressive. While Mother may have made progress in addressing her communication skills, the testimony, evidence and her courtroom behavior are clear and convincing evidence that the child's stability would be at a severe risk if reunified with her. There was testimony about an incident in August of 2022 where the Mother was shot during an argument. Arguments involving

the Mother and multiple other people during visits and outside of visits over the entire course of this case demonstrate a pervasive pattern.

(J.E., Sept. 16, 2024, R. 377.)

{¶ 54} We note that the court is only required to find one of the R.C. 2151.414(E) factors present to enter a finding that a child cannot or should be placed with a parent. *In re D.H.*, 2022-Ohio-2780, ¶ 29, citing *In re L.W.*, 2019-Ohio-1343 (8th Dist.). Here, the court made five. According to R.C. 2151.414(E), if the court determines, by clear and convincing evidence, that one or more of the (E)(1)-(16) factors exist, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent. Because the trial court found five of the factors set forth in R.C. 2151.414(E) applied in S.S.'s case, it correctly found that S.S. cannot or should not be placed with either parent. Furthermore, the trial court fittingly acknowledged that "[t]he issue before the court is the child's best interest, not the Mother's progress. . . . None of the witnesses who testified in Mother's case addressed the child's best interest[.]" (J.E., Sept. 16, 2024, R. 377.)

{¶ 55} After reviewing the entire record, we cannot say that the juvenile court's decision was against the manifest weight of the evidence when it granted the Agency's motion for permanent custody of S.S. and terminated Mother's parental rights. Accordingly, Mother's second assignment of error is overruled.

{¶ 56} Judgments affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MARY J. BOYLE, JUDGE

LISA B. FORBES, P.J., and
MICHAEL JOHN RYAN, J., CONCUR